THE WESTERN AND SOUTHERN LIFE INSURANCE
COMPANY *v.* VALE.

[No. 26,998. Filed January 25, 1938. Rehearing denied
April 5, 1938.]

*Morton C. Embree* and *Charles O. Baltzell,* for appellant.

*McDonald & McDonald,* for appellee.

FANSLER, J.—Appellee brought this action, by complaint in two paragraphs, seeking to collect upon an alleged parol contract of industrial insurance. There was a trial by jury, and a verdict and judgment for appellee.

Error is assigned upon the overruling of demurrers,

and the overruling of appellant's motion for a new trial.

The material facts are not in dispute. On August 15, 1932, appellant's local agent and its district superintendent called upon appellee and solicited him to purchase a policy of industrial insurance. Appellee already had a small policy with appellant, upon which the premium was 35 cents per week. Appellee, pursuant to the solicitation, signed an application for an additional policy of $761, for which the premium was $1.29 per week, and paid two weeks' premium in advance. He signed the following application:

"Form 3 Ed. 11-30.
"Application to
"The Western and Southern Life Insurance Co.
"Home Office, Cincinnati, Ohio.

"Debit No. 112.6.

"District: Vincennes, Indiana.

"Agent: G. Steimel.      For Home Office Use Only.

"Asst. Sup.: Everett Loving

"1.  Print full name of life proposed for insurance: Lon Vale.

"2.  White or Black.

"3.  Male or Female.

"4.  Married or Single.

"5.  Residence: No..... Street, Ceder St.; City, Bicknell.

"6.  Occupation: Miner.  Is life proposed NOW employed?  Yes.  Name and address of employer: Knox Consolidated Coal Co.

"7.  Born: Date, Sept. 19, 1878.  Where: Ind.

"8.  Age next birthday: 55 years.

"9.  Amount of insurance: $761.00  (754).

"10.  Plan: L.

"11.  Premium: 1.29 cents (130)

"12.  If life proposed is now insured in this company, give particulars of policies:
"Industrial Policy, Western Southern Nos. 868-9090. Year of issue: 7-21-30. Amount of insurance: 231. Premium: 35.

"13.  Ordinary Policy Nos.: None. Year of issue: None. Amount of insurance: None.

"14. If insured in other companies, give name and amounts: None.

"15. Has life proposed been rejected by this or any other company? No.

"16. Has life proposed any physical or mental defect or infirmity? No.

"17. When last sick? None. What illness? Serious.

"18. Names of doctors: None.

"19. Has life proposed now or ever had: Heart disease? No. Lung Disease? No. Cancer or tumor? No. A severe injury? No. Kidney disease? No. Stomach disease? No. Convulsions? No. A surgical operation? No. Liver disease? No. Bowel disease? No. Goitre? No. A serious illness? No. Bladder disease? No. Rheumatism? No. Diabetes? No. Medical or other treatment in a hospital or institution? No.

"20. Is life proposed blind or partly blind in one eye? No. Deaf or partly deaf? No. Lame or deformed in any way? No. Is life proposed now in sound health? Yes. Blind or partly blind in both eyes? No. Dumb? No. Has life proposed lost an arm, leg, hand or foot? No.

"I hereby declare that the information herein is true and I waive the privileged character of all information concerning my state of health at any time, and further declare that I AM NOW IN SOUND HEALTH.

"x  Lon Vale        Relationship of person who signs to life proposed: Self.

"Signature of life proposed if over 15 years old, otherwise by parent or guardian."

The agent made the following certificate, which was attached to the application:

### "Agent's Certificate.

"Did you see applicant sign this application? Yes.

"Do you believe the life proposed a desirable insurance risk? Yes.

"With whom does life proposed live? Family.

"Relationship: Family.

"Who will pay the premiums? Lon Vales.

"Relation to life proposed: Self.

"Is any other person paying premiums on life proposed? No.

"Name and relationship: None.

"Is life proposed related, by blood or marriage, to you or any employe of the company? No.

"Amount collected on this application: 2.58 cents.

"Dated: 8-15-1932.

"(signed) G. Steimel, Agent."

The following receipt was executed by the agent and delivered to appellee:

"Deposit of $2.58 by Lon Vales with application this day made to the Western and Southern Life Insurance Company for a policy of industrial life insurance on the life of Lon Vales is hereby acknowledged. Said amount is to be applied on account of premiums in the event such policy is issued, otherwise to be returned.

"Provided the insured be in sound health and over six months of age on the date of said application, the company's liability under such policy, if and as issued, shall commence as of the date of said application.

"Dated: 8-15-32.

"G. Steimel, Agent.

"Return this receipt if you get a policy, and see that the payment is entered in your book.

"(See notice on other side.)"

Reverse side: "If the holder of this receipt does not receive a policy of insurance or the return of the money herein receipted for within three weeks write, stating name of agent and particulars, to

"The Western and Southern Life Insurance Co.

"Fourth St. and Broadway,

"Cincinnati, Ohio."

Appellee was taken to a doctor for medical examination. The examiner's report is as follows:

"Medical examination ordered,

"F. J. Woehnker, Superintendent

or Detached Asst. Supt.

"Date: 8-16-32.

"Medical Examiner's Report.

"Note: Medical Examiner will not be allowed fee for examination unless this application bears the personal signature of the Superintendent or detached Asst. Supt.

"To be answered by life proposed for insurance.

"1. Print full name of person examined: Lon Vale.

"2. You age next birthday: 55 years.

"3. Have you any physical or mental defect or infirmity? No.

"4. When last sick? None. What illness?.......
Names of doctors: ........

"5. Has life proposed now or ever had: Heart disease? No. Lung disease? No. Cancer or tumor? No. A severe injury? No. Kidney disease? No. Stomach disease? No. Convulsions? No. A surgical operation? No. Bowel disease? No. Goitre? No. A serious illness? No. Rheumatism? No. Diabetes? No. Medical or other treatment in a hospital or institution? No. Liver disease? No. Bladder disease? No.

"6. Is life proposed blind or partly blind in one eye? No. Blind or partly blind in both eyes? No. Deaf or partly deaf? No. Dumb? No. Lame or deformed in any way? No. Has life proposed lost an arm, leg, hand or foot? No. Is life proposed now in sound health? Yes.

"I hereby declare that the information therein is true and I waive the privileged character of all information concerning my state of health at any time, and further declare that I AM NOW IN SOUND HEALTH.

"Lon Vale      Relationship of person who signs to life proposed: Same.

"Signature of life proposed if over 15 years old, otherwise by parent or guardian.

"To be answered by Examiner.

"A. Are you satisfied as to the identity of life proposed? Yes.

"B. Does he appear older than age given? No.

"C. Does his appearance indicate good health and habits? Yes.

"D. Is heart normal? Yes.

"E. Are lungs normal?

"F. Where was this examination made? Your office or applicant's residence? Office. If elsewhere, give address.

"G. White ~~Black~~

"H. Male ~~Female~~

"I. Height? 5 ft. 8 in. Weight? 195 lbs.

"J. Are there any circumstances connected with

the habits, health or surroundings that the company should know? No.

"I have this 16 day of Aug. 1932, PERSON-ALLY seen and EXAMINED the life proposed for insurance. I am of the opinion that said life is in SOUND ~~FAIR POOR~~ health and is safely insurable.

"G. H. Wilson, M. D.    Physician's signature.
"Remarks: Inspected Aug. 16, 1932.
"E. Loving, Supt. O. K. Rejection File Checked VA."

It was understood between the parties at the time that the insurance applied for was the same as appellee already had, known as a "whole life industrial policy." The application, receipt, agent's certificate, and medical examiner's report were all upon forms prepared and furnished by the company to the agent or superintendent. Appellee could not read. At the time the receipt was executed and delivered to appellee, the company's representative told him that if he got a limb cut off or an eye put out he would be paid one-half the amount in money and be given a paid-up policy for life; that the receipt was just as good as the policy; and that the insurance was in effect from the date of the receipt. On the next day the district superintendent took appellee to a doctor for examination. The papers referred to were sent forward to the company. On August 18th appellee's left hand was cut off just above the wrist in the mine where he was working.

Appellant called as a witness the manager of its industrial insurance department at its home office in Cincinnati, who passed upon applications for the issuance of industrial policies. He testified that, when applications come in, he examines them, and if the case appears to be irregular he has them investigated; that: "When an application comes in, if it appears to be regular we issue the policy. If there was any irregularity, in some cases we risk the irregularity and in others we delay issuing a

policy and make an investigation. In this particular case the occupation of the applicant was that of a coal miner, and in applications where the premiums were in excess of what we consider reasonable for the applicant to pay we questioned the ability of the applicant to pay it. In such an instance we would write to the superintendent and ask him to personally investigate and see if the applicant was in position to meet the weekly premium payments." He testified that he had seen the application; that :"It came into the home office on August 22, 1932. It came into my hands on the same day; upon receipt of it I wrote a letter to the company's manager at Vincennes questioning the ability of the applicant to pay the premiums. No policy was issued upon this application; it was not issued because we were questioning the ability of the applicant to pay the premiums. On August 22nd, 1932, the home office had not received any information in respect to the injury of the plaintiff received on August 18th, 1932." He testified that the application was not rejected on account of the physical condition of the appellee; that he had been reported a first-class risk; that "if a favorable letter had been returned to me on my letter concerning the ability of the applicant to pay premiums I would have written the policy"; that, when he got the information that appellee had lost a hand, nothing further was done toward approving or disapproving the application, but that it was turned over to the claim department. The policy contracted for was to be the same, except as to amount and premium, as the one appellee already had. The policy contained a provision to the effect that the company assumed no obligation unless, on the date and delivery of the policy, "the insured is alive and in sound health."

In most jurisdictions it is held that a receipt, stating that the insurance shall be in force from its date, provided the application is approved and accepted at the

home office of the insurer, is ineffectual in providing protection to the applicant until the application is approved, and that it is wholly in the power of the company to reject the application, after death or injury insured against, arbitrarily and without giving any reason for the rejection. An examination discloses that these cases are founded upon the authority of *Insurance Company* v. *Young's Administrator* (1874), 23 Wall (U. S.) 85, 106, 23 L. Ed. 152, 154. They are based upon the theory that the application is an initial step; that the absolute right to accept or reject is with the company; that, until there is an acceptance, there is no contract. But it is said: "The acceptance was a qualified one, and there was none other."

But there are cases to the contrary, which hold that the insurance is effective as of the date of the receipt, subject to the right of the company to reject as of the date of the application, if, upon reasonable grounds, the applicant was not insurable upon that date. *Reynolds, Adm'x.* v. *Northwestern Mutual Life Ins. Co.* (1920), 189 Iowa 76, 176 N. W. 207; *Gonsoulin* v. *Equitable Life Assurance Society* (1922), 152 La. 865, 94 So. 424. In *Gardner* v. *North State Mutual Life Ins. Co.* (1913), 163 N. C. 367, 79 S. E. 806, doubt is indicated as to whether the company "can arbitrarily or even unreasonably" reject the application or withhold its approval. In *Starr* v. *Mutual Life Ins. Co.* (1905), 41 Wash. 228, 232, 83 Pac. 116, 117, it is pointed out that, if the company has the right to arbitrarily reject the application in the event of death of the applicant before the policy is issued, no benefit is derived from that portion of the premium which covers the time between the application and the acceptance and issuance of the policy. This is undoubtedly true, since, if the company is not bound to pay a loss occurring in the period, there is no insurance for the period. It is said: "The chief object of the provision would therefore seem to be to enable the insurance com-

pany to collect premiums for a period during which there was in fact no insurance, and consequently no risk." In *Francis* v. *Mutual Life Insurance Co.* (1910), 55 Ore. 280, 106 Pac. 323, in which it was held that the company was not liable where the death occurred before the acceptance of the application and the issuance of the policy, the court characterized such a receipt as a mere trick upon the part of the insurance company to deceive an applicant in the belief that he has temporary insurance and thereby induce him to part with his money in advance. In other words, it is recognized that such a receipt is calculated to convey the impression to the applicant for insurance that he is insured, and to procure money from him as premium for insurance over a period when he is not insured at all. Put otherwise, it means that, by a device calculated to deceive, the applicant is defrauded out of so much of the premium paid as would provide insurance for the period between the application and the acceptance and delivery of the policy. The cases will be found collected in Am. Ann. Cas. 1915B, 657, and 81 A. L. R. 333.

The cases stating the view that the company may arbitrarily elect not to accept if death occurs are based upon the assumption that there is no contract between the parties until the company elects to accept or reject the application; that the application is but an offer; and, still, in the leading case, it is said: "The acceptance was a qualified one, and there was none other." We cannot escape the view that where the facts are, as in the case at bar, and an agent of the company is authorized to solicit business, and is equipped with printed forms or receipts, prepared by the company and intended to be delivered to applicants for insurance upon the payment of a premium in advance, which say to the applicant that, under some circumstances at least, the company's liability shall commence

from the date of the application, and the applicant pays the premium, and the receipt is executed by the company's agent having authority to execute it, and delivered to the applicant, a contract is then and there created between the company and the applicant. It may be that the acceptance of the application and of his money is a "qualified one," but it cannot be doubted that the company has represented to the applicant that it has become conditionally liable under the policy for which he has applied, and that the ordinary person, and especially the ordinary applicant for industrial insurance, would be led to believe that he is conditionally insured. It would be unconscionable to permit an insurance company, issuing such a receipt and receiving a premium from an applicant, part of which was to pay for protection under its policy from the date of the application to the date of acceptance, to say that it had not bound itself to give anything whatever for that portion of the premium; that it deliberately intended to accept the premium for that period, but that it never intended to, and that it had not insured the applicant for that period. In construing the language of a contract, the primary purpose is to discover the mutual intention of the parties, and the intent of one party only does not suffice. Where there is doubt, the contract will be interpreted in the sense that the promisor knew, or had reason to know, the promisee understood it. A construction that works a forfeiture will be avoided, as well as a construction that is inequitable and gives an unfair or unreasonable advantage to one of the parties. The court will consider the situation and condition of the parties and the purpose of the contract. Where printed forms are used, the words will be construed most strongly against the one preparing them; and it will not be supposed that, in preparing the form, the words were used for the purpose of inducing the other to act or part with a consideration on the supposition

that his words mean one thing while he secretly harbors the intention to contend that they mean something quite different. A construction will be avoided that imputes bad faith or fraud to one of the parties. Appellee did not solicit appellant to insure him. On the contrary, appellant, through its agents, solicited appellee to purchase insurance. He was solicited to fill out the application form, by which the company sought certain specified information, and, by answering the questions, he made certain representations, binding upon him in so far as they were material. Among other things, he represented himself to be physically sound and in good health. He paid the amount of the premium requested, and it was represented to him, not only by the agents, but by the terms of the receipt, that he was then insured. The terms and conditions, the inquiries, and the representation that insurance began immediately, were all dictated by the company. It is inconceivable, in the face of all of the circumstances, that appellee could have understood and believed that under no circumstances was he insured until after the acceptance of the application. The contract to insure for the period before acceptance of the application may have been qualified or conditioned, but the company cannot be permitted to say that under no conditions or circumstances was it liable, for the receipt did not say that the applicant was *not* insured, but that he *was* insured. If the company was bound only if it chose to be bound, or if it could disclaim liability for some arbitrary reason of its own choosing, it was not bound at all. An applicant for industrial insurance, or any reasonable person, understanding that he was insured but qualifiedly or conditionally, would look to the field covered by the company's inquiries for the material out of which the qualification or condition would arise, and would assume that if the representations he had made, and upon which the company had been willing to become tentatively

liable, were true, the company was bound. No other construction can be put upon the receipt that does not involve either an entire misunderstanding of the agreement upon the part of the applicant, or his deliberate and willful payment of money to the company as a gift. It must be concluded that the applicant understood the contract to mean that he was insured if his representations were true. It cannot be assumed that the applicant knowingly and intentionally paid his money to the company without any consideration, nor can it be assumed, in fairness to the company, that it intended to take the applicant's money without any consideration, and with the intention that he should not be insured upon any conditions for the period between the signing of the application and its acceptance and approval. Since no other reasonable construction is suggested, the agreement must be construed as intending that he be insured for the period, if reasonably insurable. That is undoubtedly what the applicant understood and believed he was agreeing to. It would be unconscionable to permit the company to assert that there was a meeting of the minds upon any other basis.

After the application was signed, and the premium paid, and the receipt executed and delivered, appellee was taken to a doctor for examination, the character and extent of which was indicated and prescribed by the blank printed form upon which the medical examiner was to make his report. The information sought did not include physical tests, such as urinalysis, blood pressure, pulse, temperature, and the like, from which the company's medical advisers at its home office might arrive at an independent conclusion as to the physical condition of the applicant without a personal examination. It contemplated only that the medical examiner give his conclusions. In this respect, the information sought in regard to applicants for industrial insurance seems to differ

somewhat from that required in applications for ordinary life insurance. Appellant's manager testified that the report of the examiner was accepted as to the insurability of the applicant, and that approval and acceptance of the application was withheld only for the purpose of determining whether or not the applicant, who was a coal miner, would be able to pay the premiums. The premiums were payable in advance, and he had paid the premium for two weeks, and, under the contract, as we have construed it, he was insured if the representations in his application were true.

In the application blank no information is sought regarding the applicant's ability to pay. Industrial insurance is not designed for persons of assured income. The insurance was not sold on credit. Even if there had been an inquiry in the application as to the amount of the applicant's income, the total amount of his insurance, $992, and of the premiums, $1.64 per week, is not beyond the means of even a casual laborer, and, having solicited the insurance and accepted the initial premium, over-insurance could not be reasonably urged as a basis for refusing the risk, and the applicant's income and ability to pay cannot be considered a substantial reason for rejecting the application.

The damages recovered are in conformity to the following instruction: "The court instructs you that the damages assessed should be exactly commensurate with the loss sustained, if any, neither more or less, and in this case it should be the amount which the defendant agreed should be paid to the plaintiff, if any, in the event of the loss of a hand by severance above the wrist, plus the present worth of the premiums plaintiff would be required to pay to secure a paid up whole life industrial policy such as defendant agreed to issue to the plaintiff, if you find from a fair preponderance that it did so agree to issue such a policy, during

the period of the reasonable expectancy of the plaintiff, to which you may add interest at the rate of six per cent from the time said amount or amounts, if any, became due and payable to the plaintiff, not excepting, however, the sum of fifteen hundred dollars ($1,500.00), prayed for in his complaint." Appellant says that "this instruction is erroneous for the reason that the damages, if any, in respect to the failure to issue the paid-up policy for life in the sum of seven hundred sixty-one dollars, must be measured by the present worth of the face of such paid-up policy, based upon the appellee's expectancy of life, and not by the cost of procuring a policy in lieu of the one alleged to have been contracted for." The authorities cited by appellant do not support its contention, and, on the contrary, a number of them approve the rule laid down in the instruction. The instruction correctly states the measure of damages.

Both paragraphs of complaint allege that there was an "oral" contract of insurance. The answers brought in the written instruments above referred to. It is conceded by appellant that there may be a parol contract of industrial insurance, so that no question is made upon the form of the contract. With the adequacy of the complaint we are not concerned, since, on appeal, it may be treated as amended to conform to the facts, and, if the case were reversed and a new trial granted, it could be amended then, and, since the facts are not in dispute, the result is inevitable; appellee is entitled to recover.

Judgment affirmed.