PSI ENERGY, INC., Plaintiff,

v.

EXXON COAL USA, INC., and Exxon Corporation through its division Exxon Coal and Mineral Company, Defendant.

No. IP 92–645–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Decided Dec. 28, 1992.

Amended Jan. 7, 1993.

Nunc Pro Tunc Dec. 28, 1992.

Robert F. Zoccola, Michael A. Bergin, Thomas L. Davis, Alan S. Brown, Locke Reynolds Boyd & Weissell, Indianapolis, IN, Donald P. Bogard, PSI Energy, Inc., Plainfield, IN, for plaintiff.

Richard Wilson, Fulbright & Jaworski, David J. Beck, Beck Redden & Secrest, Houston, TX, for Exxon Corp.

Robert A. Burgoyne, Fulbright & Jaworski, Washington, DC, for Exxon Coal USA, Inc.

James K. Wilson, James J. McGowan, Jr., Exxon Coal and Minerals Co., Houston, TX, for Exxon Coal and Minerals Corp.

William P. Wooden, John D. Nell, Julie Michaelis, Wooden McLaughlin & Sterner, Indianapolis, IN, for Exxon Coal USA and Exxon Corp.

## ENTRY

BARKER, District Judge.

The controversy in this lawsuit centers on the meaning of certain provisions in a contract that PSI Energy, Inc. ("PSI") and Exxon's predecessor in interest entered into eighteen (18) years ago, and that the parties modified in 1984. The contract, as amended, in general calls for Exxon Coal to continue to supply PSI with more than three million tons of coal annually for the next ten years at prices that are subject to escalation. Plaintiff PSI asks the Court to enter a declaratory judgment that: (1) the written offer which PSI received from the Black Beauty Coal Company ("Black Beauty") is a "competitive offer" within the meaning of the Agreement; (2) Exxon did not meet the competitive offer, and therefore, the Agreement shall terminate on December 31, 1992, or at PSI's election, at the end of the temporary continuance of deliveries as provided for in Section 7.04 of the Agreement; and (3) Exxon is prohibited from taking any action, at law, in equity, or otherwise, from enjoining or preventing or seeking to enjoin or prevent, PSI from accepting and executing a new agreement for the supply of coal under the contract.[1] A bench trial was conducted on December 1st, 2nd, 3rd, 4th, 7th and 8th, 1992. Having heard and considered the evidence, the Court hereby *GRANTS* PSI's request for declaratory relief, and holds that the Black Beauty offer is a "competitive offer" and that Exxon has failed to meet that offer. The Court, accordingly, enters the following findings of fact and conclusions of law.

### Findings Of Fact

1. Plaintiff PSI is an Indiana corporation having its principal place of business in Plainfield, Indiana.

2. Defendant Exxon Corporation is a New Jersey corporation having its principal place of business in a state other than Indiana. Defendant Exxon Coal USA, Inc. is a Delaware corporation having its principal place of business in a state other than Indiana. Exxon Coal is a subsidiary of the Exxon Corporation. Exxon Coal USA, Inc., and Exxon Corporation are hereinafter referred to collectively as "Exxon".

3. The amount in controversy in this action exceeds $50,000.00, exclusive of interest and costs.

4. On April 26, 1974, PSI, which was then known as Public Service Company of Indiana, Inc., and The Carter Oil Company

---

1. The Court will not address PSI's demand for injunctive relief because the parties have by their stipulation withdrawn that claim from these proceedings at this time. *See* Stipulation, November 18, 1992, at ¶ 4.

("Carter") signed a long-term Coal Sale and Purchase Agreement (the "Agreement"). Pursuant to the Agreement, PSI agreed to purchase, and Carter agreed to supply, certain quantities of coal each year.

5. The Agreement was assigned by Carter to the Monterey Coal Company ("Monterey").

6. Exxon Coal USA, Inc. is the successor by merger to the interests of Monterey.

7. On February 6, 1984, the parties entered into a Contract Modification ("Modification"), which included revisions to Article VII of the Agreement. Article VII is otherwise known to the parties as the "reopener."

8. Article VII of the Agreement, as modified, provides:

7.01 The Price of coal delivered hereunder shall be computed from a Base of $11.07 per ton, hereafter called the "Base", and shall be determined by adding to or deducting from the Base appropriately for each price adjustment factor listed in Exhibit "A" attached hereto and as a part of this Agreement, and in accordance with the adjustment procedures there stated. The price as so determined shall be the basis for computing the compensation for deviations in the gross calorific value as provided in Article X.

7.02 *Price Renegotiation.* The Base specified above shall be subject to renegotiation as provided in this Article, with the next new Base to be effective as of January 1, 1993; and, if this Agreement continues in effect to the successive times herein specified, said Base (and any coal price agreed to pursuant to any renegotiation or competitive offering as provided for herein) shall again be subject to renegotiation, effective as of the start of the 16th contract year, and the start of the 21st contract year, all in the manner herein provided. For purposes of this Article, the first contract period started January 1, 1978, and ended December 31, 1982; the second contract period started January 1, 1983, and ends December 31, 1987; the third contract period starts January 1, 1988, and ends December 31, 1992; the fourth contract period starts January 1, 1993, and ends December 31, 1997; and the fifth contract period starts January 1, 1998, and ends December 31, 2002. For purposes of this Article, the calendar year 1978 shall be deemed the first contract year.

7.03 Either party may require renegotiation of the Base by giving to the other, at any time in the first thirty (30) days of the fourth year of any contract period except the second contract period, written notice of its desire to do so. Promptly after the giving of such notice, the parties will commence negotiations to agree upon a new Base to be effective as of commencement of the next contract period. Each party covenants with the other to participate in such negotiations in a good faith effort to reach agreement. If the parties are unable to reach agreement, BUYER will accept SELLER's last offer or present SELLER with a firm, written offer which it has received from another supplier, which it is willing to accept, for the supply of coal called for under the remaining term of this Agreement (herein referred to as a "competitive offer"). It shall also provide SELLER with documentary proof of such offer, and permit SELLER to examine all supporting data and information submitted with the offer. SELLER shall have the right to meet such competitive offer.

If, by the one hundred and eightieth day preceding the end of the contract period in which notice of price renegotiation was given, the parties have agreed upon a new Base, appropriate changes shall be made to the adjustment factors provided in Exhibit "A". The Price of coal effective at the commencement of the next contract period shall be computed from the new Base adjusted under the provisions of Exhibit "A" from the reference date of the new Base. If, by such time, the parties have not reached agreement upon a new Base and SELLER declines to meet a competitive offer submitted by BUYER pursuant to the above provisions, this Agreement shall terminate at the end of the contract period in which notice of price renegotiation was given, or at BUYER's election, at the end of the temporary continuance of deliveries as provided for in Section 7.04.

7.04 If in any such renegotiation of Base, the parties fail to reach agreement on a new Base and if SELLER declines to meet the competitive offer, and BUYER desires SELLER to continue delivering coal, then SELLER agrees to continue deliveries under the terms and conditions of this Agreement for the period of time BUYER shall designate, but not to exceed twenty-four (24) months beyond the current contract period. The Price to be paid for such additional coal shall be determined from a new Base equal to SELLER's last Base proposed in good faith during the negotiations, adjusted under appropriate amendments to Exhibit "A", from the reference date of the new Base.

7.05 It is understood and agreed that the purpose and intent of Sections 7.01 to 7.04, inclusive, are only to provide for renegotiation of Base and Exhibit "A", and neither party shall inject into such negotiations, as a condition of agreement upon a new Price for the coal, any demand or request that other terms and conditions of this Agreement be altered.

Plaintiff's Exhibit 1.

9. The primary purpose of Article VII of the Agreement is to manage market risk. *See* Brister Testimony, Trial Transcript ("Tr.") at 657–58; Veenstra Depo. I, at 22. The reopener allows the parties to reconcile deviations in the contract price with the prevailing market price. *See* Brister Testimony, Tr. at 657–58; Veenstra Depo. II, at 140.

10. Prior to the instant dispute, PSI had never solicited competitive offers pursuant to Section 7.03.

11. Under the Modification, PSI was obligated to purchase at least 3,000,000 tons of coal annually, and Exxon was obligated to supply no more than 3,300,000 tons annually, from January 1, 1984 through December 31, 2002. *See* Agreement, Contract Modification at 2.

12. Coal is not a fungible resource. Its value to a utility depends on several defining characteristics which render any given quantity of coal unique. These include sulfur, BTU, ash and water content; ash fusion temperature; hardness; and delivery factors. *See* Veenstra Testimony, Tr. at 13–26.

13. The coal supplied by Exxon under the Agreement has come primarily from Exxon's Monterey No. 2 mine, located in Clinton County, Illinois, which is part of the Illinois coal basin.

14. On the average, coal produced at the Monterey No. 2 mine and delivered to PSI yields on combustion 6.2 pounds of sulfur dioxide per million BTU's (# $SO_2$/MMBTU). Coal from the Monterey No. 2 mine is considered "high sulfur coal."

15. The Clean Air Act (CAA) requires all states to formulate an implementation plan (a "SIP") for national primary and secondary ambient air quality standards. *See* 42 U.S.C. § 7410.

16. In 1988, pursuant to the CAA, the State of Indiana adopted a SIP for Gibson County that restricted PSI's sulfur dioxide emissions at the Gibson generating station.

17. Beginning January 1, 1992, the Gibson SIP limited $SO_2$ emissions to 3.57 pounds per million BTU, and further reduces those emissions to 3.13 pounds of $SO_2$/MMBTU on January 1, 1994. *See* Veenstra Testimony, Tr. at 16.

18. In 1990, amendments were passed to the CAA, which further affected the ability of PSI and other electric utilities to burn high sulfur coal. The amendments progressively reduce the amount of sulfur dioxide which utilities may emit. Specifically, the CAA imposes system-wide emissions limits of 2.5 pounds of $SO_2$/MMBTU starting January 1, 1995, *see* 42 U.S.C.A. § 7651c (West Supp. 1992), and 1.2 pounds of $SO_2$/MMBTU starting January 1, 2000, *see* 42 U.S.C.A. § 7651d (West Supp.1992).

19. As the cost to utilities of burning high sulfur coal has increased, the market value of high sulfur coal has decreased significantly. *See* Veenstra Testimony, Tr. at 21; Chancellor Testimony, Tr. at 264–65. Coal from the Illinois basin has not been immune from these market forces; the price of coal from the Illinois basin has dropped steadily over the last five years, especially high sulfur coal. *See* Chancellor Testimony, Tr. at 265.

20. The market for large tonnages of high sulfur coal is virtually non-existent. *See* Rawl Depo. at 157.

21. On January 7, 1991, pursuant to Section 7.03 of the Agreement, PSI gave written notice to Exxon of its desire to renegotiate the Base as provided in Article VII. *See* Plaintiff's Exhibit 14.

22. As of May, 1991, Exxon also believed that the price that it was charging PSI for its coal was higher than what the coal would sell for on the open market. *See* Goodrich Depo. at 71.

23. Exxon made its first reopener proposal to PSI on July 17, 1991, offering an undelivered price of $20.10 per ton. Subsequent offers by Exxon proposed higher prices. On November 26, 1991, Exxon proposed an undelivered price of twenty-five dollars ($25.00) per ton. *See* Plaintiff's Exhibit 35. This offer was soon withdrawn, and on December 3, 1991, Exxon proposed a delivered price to the Gibson Station of twenty-nine dollars and sixty cents ($29.60) per ton. *See* Plaintiff's Exhibit 38.

24. On April 15, 1992, Exxon Coal and PSI agreed that: (1) their positions had become polarized, and that they had been unable to reach agreement pursuant to Section 7.03 of the Agreement; (2) PSI would submit a competitive offer along with an Exhibit "A" to Exxon Coal as early in May, 1992 as reasonably practicable; and (3) if Exxon Coal decided to meet the competitive offer, it would do so by written notification delivered to PSI no later than 5:00 p.m., Houston time, on July 3, 1992. *See* Plaintiff's Exhibit 53.

25. In a letter to PSI dated April 28, 1992, Exxon Coal presented PSI with its last offer within the meaning of Section 7.03 of the Agreement. Exxon proposed a price of $30 per ton f.o.b. Gibson Station. *See* Plaintiff's Exhibit 58. PSI did not accept Exxon Coal's offer.

26. By May 11, 1992, PSI had received offers from three coal suppliers to furnish coal under the Agreement. These offers came from the Black Beauty Coal Company, Freeman Coal Sales, and Franklin Coal Sales, *see* Veenstra Testimony, Tr. at 70–71, and called for the same quantity of coal as

the Agreement, better quality, with penalties, lower price, and greater delivery flexibility. *See* Veenstra Testimony, Tr. at 76.

27. PSI employed two mining consultants, John Sabo of Marshall Miller & Associates, and Seth Schwartz of Energy Ventures Analysis, Inc., to evaluate the offers. Mr. Sabo is a mining engineer, and Mr. Schwartz is an expert on fuel contracts and pricing.

28. In terms of the Black Beauty offer, the objective of the Marshall Miller study was "to determine if BBCC [Black Beauty Coal Company] has the resources and capability to produce the quantity and quality of coal as bid, in addition to meeting current coal supply contract commitments." *See* Plaintiff's Exhibit 61, Marshall Miller & Associates Report, at 1. Marshall Miller concluded that "BBCC is a viable operation and has the resources and capability to provide the quantity and quality of coal as bid [to PSI] in addition to meeting its current supply contract obligations." *Id.* at 6; *see also* Sabo Testimony, Tr. at 424.

29. Mr. Schwartz's analysis of the three offers was comparative:

In my opinion, all three offers received by PSI would qualify as "competitive offers" under Section 7.03 of the Agreement. All three offers are firm and in writing. All three suppliers are large producers with the reserves and the production capacity to perform the proposed contract. The coal quality specified in the three offers is generally equal to or superior to the quality specified in the Exxon Agreement.... In my opinion, considering all factors, the Black Beauty offer is the best offer for PSI, and should be submitted to Exxon as the "competitive offer".

Plaintiff's Exhibit 61, Energy Ventures Analysis Report at 2.

30. Mr. Schwartz advised PSI that Exxon's $29.60 offer was not competitive. *See* Schwartz Testimony, Tr. at 449.

31. Mr. Schwartz advised PSI that Black Beauty had the financial reserves to compensate PSI if they were to default. *See* Schwartz Testimony, Tr. at 461–2.

32. The analyses of Marshall Miller and Energy Ventures Analysis were forwarded to Exxon. *See* Veenstra Testimony, Tr. at 89.

33. Based on the opinions of Messrs. Sabo and Schwartz, on May 13, 1992, PSI timely submitted to Exxon the offer from Black Beauty Coal Company as the competitive offer called for under Section 7.03.

34. Pursuant to the parties memo of understanding of April 15, 1992, Exxon had until July 3, 1992 to meet the competitive offer.

35. On July 1, 1992, Exxon informed PSI that, based on certain assumptions, "meeting such Black Beauty offer would require that the new "Base" (which would become effective under Section 7.01 of the Agreement on January 1, 1993) would be $23.266 per ton." *See* Plaintiff's Exhibit 77, at 2.

36. On August 13, 1992, PSI informed Exxon that in its view, "Exxon [had] declined to meet th[e] Competitive Offer" and that "PSI hereby notifies Exxon that it does not elect to receive any temporary deliveries after December 31, 1992 . . . ." Defendant's Exhibit 250.

37. Black Beauty believes that it can supply the coal as described in its offer. *See* Chancellor Testimony, Tr. at 288, 325.

38. PSI has informed Black Beauty that it is willing to sign the Black Beauty offer. *See* Chancellor Testimony, Tr. at 325.

39. PSI presented the Black Beauty offer to Exxon. *See* Veenstra Testimony, Tr. at 88.

40. The cost to PSI to purchase coal furnished pursuant to the Black Beauty offer is less than what PSI would have to pay to Exxon based on its offer of $23.266 per ton. *See* Plaintiff's Exhibit 61; Veenstra Testimony, Tr. at 101–105.

41. PSI believes that the Black Beauty offer provides more value to PSI than does Exxon's offer. *See* Veenstra Testimony, Tr. at 153–54.

42. Exxon believes that Section 7.05 of the Agreement prevents extending the scope of the reopener beyond reevaluation of the Base. *See* Brister Testimony, Tr. at 710–11.

43. PSI believes that Section 7.05 is not applicable to any competitive offer submitted pursuant to Section 7.03, but instead applies strictly to the "renegotiation" between PSI and Exxon as outlined in Section 7.03. *See* Veenstra, Depo. II at 28–29.

44. The parties have differing views concerning what constitutes a "competitive offer" under Section 7.03. Exxon's position is that, with the exception of the Base, any competitive offer must have substantially the same terms as the Agreement. *See* Brister Testimony, Tr. at 717. In addition, "Exxon Coal contends that for PSI to submit a 'competitive offer' to Exxon Coal, PSI is required to provide an offer which specifies a new 'Base,' *determined on a delivered basis to PSI's Gibson Plant . . . .*" Plaintiff's Exhibit 77, at 2 (emphasis added).

45. PSI, in contrast, contends that Section 7.03 requires Exxon to match all the terms and conditions of the competitive offer, or, at a minimum, match those terms that PSI deems significant. *See* Veenstra Depo. II at 37–41. In a letter dated May 12, 1992, Mr. Veenstra informed Wendell Ellis that "[u]nless Exxon matches all the terms and conditions of this competitive offer by or before 5:00 p.m., Houston time, July 3, 1992, the Agreement by which Exxon Coal USA, Inc. supplies coal to PSI Energy will terminate under the terms of Article VII." Plaintiff's Exhibit 63.

46. Based at least in part on experience with other contracts, the parties contemplated the necessity of discussing the terms of any competitive offer and adjusting their negotiating positions accordingly. *See* Brister Testimony, Tr. at 679; Veenstra Depo. III, at 444–451; Ashley Depo. II, at 206–08.

47. The Black Beauty contract offer is based not just on cost factors, but also on intangible elements that add value to the contract, such as the *force majeure* provision. *See* Veenstra Testimony, Tr. at 153–54. If the Black Beauty offer did not include these elements, the contract pricing scheme would be lower. *Id.* at 154.

48. The delivered price of the coal is only one of many factors that utilities consider when making their supplier selections. Oth-

er factors, such as the financial stability of the supplier, also are part of the buyer's decision calculus. *See* Hugh Rawl Depo. at 21–23.

49. Both the Preamble and Article VI of the Agreement contemplate that Exxon coal could be delivered to any of PSI's facilities. The Agreement states in pertinent part:

> WHEREAS, BUYER owns and operates an electric generation system in Indiana, and Buyer desires to secure an assured and dependable long-term supply of coal suitable for use in its existing and planned power generating stations; ...."

Plaintiff's Exhibit 1, at 1.

> 6.01 Coal shall be delivered to BUYER by SELLER F.O.B. BUYER's Gibson Power Plant, *or other points in Indiana which BUYER designates*, in railroad cars in unit trains and shall be transported at SELLER's expense. (Emphasis added).

Plaintiff's Exhibit 1, at 8. Although not a requirement of the Agreement, the Gibson Power Plant had been the exclusive recipient of coal from the Monterey No. 2 mine.

50. PSI operates power generating stations at several locations throughout Indiana. The Black Beauty offer provides for delivery of coal f.o.b. destination to any of these stations. *See* Plaintiff's Exhibit 61. PSI and Black Beauty anticipate that Black Beauty's coal will be delivered only to the Gibson, Wabash, and Cayuga power stations.

51. PSI negotiated with Exxon in good faith during 1991 and 1992.

52. Any finding of fact which is actually a conclusion of law shall be treated as a conclusion of law and incorporated into the conclusions of law which follow.

### Conclusions of Law

1. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

2. The Court has personal jurisdiction over the parties.

3. Pursuant to 28 U.S.C. § 1391(a), venue in this action is proper in the Southern District of Indiana.

4. Pursuant to the Federal Declaratory Judgment Act, as codified, the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201.

5. By its own terms, the Agreement is to be interpreted in accordance with the laws of the State of Indiana.

6. In construing contractual language, the court's primary purpose is to discover the mutual intention of the parties at the time the contract was made. *See Western and Southern Life Ins. Co. v. Vale*, 213 Ind. 601, 12 N.E.2d 350 (1938); *Shahan v. Brinegar*, 181 Ind.App. 39, 390 N.E.2d 1036, 1041 (1 Dist.1979).

7. When contractual language is unambiguous, absent reasons to rescind the contract, the court must not look beyond that language to discover the parties' intent. *See Bland v. Atlas Van Lines, Inc.*, 761 F.Supp. 82, 86 (S.D.Ind.1989); *Lewis v. Burke*, 248 Ind. 297, 226 N.E.2d 332, 337 (1967).

8. Under Indiana law the test for determining whether a contract is ambiguous is whether reasonable persons would find the contract subject to more than one interpretation. *See Williams v. National Can Corp.*, 603 F.Supp. 1268, 1275 (N.D.Ind.1985); *Fort Wayne Cablevision v. Indiana & Michigan Electric Co.*, 443 N.E.2d 863, 866 (Ind.App. 3 Dist.1983).

9. Whether contractual terms are ambiguous is a question of law determined by the court. *See Piskorowski v. Shell Oil Co.*, 403 N.E.2d 838, 844 (Ind.App. 3 Dist. 1980).

10. Under the Indiana Uniform Commercial Code, an agreement may be found not only from language, but also "by implication from other circumstances including course of dealing or usage of trade or course of performance...." Ind.Code § 26–1–201(3) (Burns Supp.1992). This section is inapplicable to the instant action, however, because there was no course of dealing or performance

between these parties as concerns the reopener provision, given that PSI had never submitted competitive offers under Section 7.03. There also was no evidence presented that was sufficient to establish a particular usage of trade.

11. Article VII of the Agreement is not ambiguous.

■ 12. Section 7.01 defines the "Base" as "The Price of coal delivered hereunder....", meaning the base for coal supplied by Exxon to PSI pursuant to the Agreement.

13. Section 7.03 addresses three distinct activities: (1) the parties' renegotiation of the Base, (2) PSI's presentation of a competitive offer, and (3) Exxon's analysis of the competitive offer and its presentation to PSI of an offer that meets the competitive offer. The language of Section 7.03 indicates that these activities are to occur sequentially. Once the renegotiation of the Base fails, PSI has the right to present Exxon with a competitive offer. Once PSI has presented Exxon with a competitive offer, Exxon may then analyze the competitive offer and exercise its right to meet the competitive offer.

14. Section 7.05 states that "the purpose and intent of Sections 7.01 to 7.04, inclusive, are only to provide for renegotiation of Base and Exhibit 'A'." Given that Section 7.01 defines the "Base" exclusively in terms of the PSI–Exxon Agreement (*i.e.* "The Price of coal delivered *hereunder*...." meaning pursuant to the Agreement (emphasis added)), Section 7.05 is a limitation only on negotiations between Exxon and PSI. Section 7.05 places no restriction on the form of the competitive offer contemplated in Section 7.03 because the source of the competitive offer is an entity other than Exxon. If the parties had intended the meaning that Exxon urges on the Court, they would not have used the proper noun "Base" in Section 7.05. The language is not ambiguous, "Base" with a capital "B" means the Exxon–PSI base.

15. Exxon's interpretation of Section 7.05 and its application to Section 7.03 is unreasonable as a matter of law. Exxon believes that, with the sole exception of the base, Section 7.05 requires the competitive offer to mirror the remainder of the Agreement.

Therefore, in Exxon's view, any competitive offer that incorporates non-base terms that differ materially from the Agreement's terms could not be a competitive offer under Section 7.03. The Court finds no justification for such a reading.

The evidence presented establishes that any given coal supplier occupies a unique market position. The competitive advantage it possesses depends on such factors as the quality of the coal it can produce, the distance that the coal must travel to the buyer, the nature of its mining operations, and other idiosyncratic variables. Not every competitive advantage, though, derives from efficiencies in the cost of production because other considerations besides cost enter into the decision calculus for the buyer. For example, the supplier's flexibility in scheduling and delivering the coal is also an important competitive dimension. *See* Masselink Depo. III, at 249. The point seems too obvious to warrant much discussion, but whether a coal buyer enters into a contract with a particular supplier depends on the totality of circumstances surrounding the contract and the overall value that it renders to the buyer. Thus, it is not impossible for a coal supplier which is situated at a farther distance from the buyer than a competitor, with an inferior quality coal, to prevail in his negotiations with the buyer by offering non-cost related concessions that offset whatever disadvantages he may face.

Exxon's reading of the Agreement would foreclose any competition on non-base terms. Such a reading not only is inconsistent with the overriding purpose of Article VII, it also directly contradicts its express language. Article VII was included in the Agreement primarily to manage market risks. Exxon's interpretation, if adopted, would shift far too much risk onto PSI by creating a barrier to competition that few coal suppliers (*i.e.* third party competitors) could overcome. The Court can find no language in the Agreement that would warrant impeding market competition in this way.

Exxon's interpretation also betrays the parties' original intent as manifested in the words they chose to incorporate in the Agreement; "competitive", as that term is

used in "competitive offer", means nothing less than fully competitive. Exxon's own reasoning supports this finding:

> [a]s a practical matter neither Exxon nor any other seller could meet literally all the terms and conditions of the Black Beauty offer. *That offer contains many idiosyncratic features tailored to the unique circumstances of Black Beauty's proposed operations.* Explicit reference is made to production at and sales from each of Black Beauty's three mines, by name; different coal quality standards for each mine; different "starting prices" are quoted for each mine; and delivered prices are calculated by adding to those "starting prices" the actual transportation costs incurred on each shipment from those mines.

Defendants' Trial Brief, at 32–33 (emphasis added).

The adage, "what is good for the goose is good for the gander," applies here. Exxon is just as uniquely situated in the market as Black Beauty. Why should the Court require Black Beauty to do what Exxon correctly implies is impossible: mirror all the terms of another coal suppliers' agreement and compete just on one term, the base? Simply put, the contract does not indicate that the parties intended that the third-party competitor would have to develop its offer shackled by the limitations that Exxon now seeks to impose. Under the Agreement, PSI had the right to obtain a competitive offer from another supplier which contained terms and conditions which were different from the terms and conditions of the Agreement.

■ 16. The Black Beauty offer submitted to Exxon on May 13, 1992, is a "competitive offer" under the Agreement.

17. Pursuant to the Agreement, a "competitive offer" is: (1) "a firm, written offer received by PSI from a supplier", (2) "which [PSI] is willing to accept," (3) "for the supply of coal called for under the remaining term of this Agreement." Agreement, Section 7.03. These elements have been satisfied. *See* Plaintiff's Exhibit 61; Veenstra Testimony, Tr. at 88.

18. Exxon argues that Black Beauty's offer is not a "competitive offer" because neither the transportation costs nor the precise tonnages to be delivered from each of Black Beauty's three mines to PSI's stations are certain, thereby making it impossible to calculate a single base that Exxon can "meet." As already explained, an important competitive dimension is the flexibility that a supplier can offer to a buyer. Simply because Exxon typically supplied coal from one mine to one station is no reason to force third-party competitors to enter into the same supply configuration. No two coal suppliers occupy precisely the same market position. Black Beauty's operations allow it to supply coal to PSI's stations from more than one mine, providing those two parties additional leeway in settling on an optimal allocation of coal. What this distribution will be depends of course on a variety of factors, many of which cannot be specified at present. Circumstances, such as trucking rates and mining operations, change. The Court can find no justification to require Black Beauty to compete on terms that, although perhaps well-suited to Exxon's situation, do not optimize its own position. As Black Beauty's President and Chief Executive Officer, Steven E. Chancellor, explained, Black Beauty's "goal obviously was to put the best offer on the table that we could put together. Take full advantage of everything we had to work with ..." Chancellor Testimony, Tr. at 271. That is the nature of competition in a free enterprise system. The Court will not read into the Agreement restrictions that impede the orderly function of the market mechanism, as Exxon's peculiar interpretation would require.

19. Exxon's arguments as concern the lack of a single base figure in the Black Beauty offer are consistent with its misinterpretation of what it must do to "meet" the competitive offer under the Agreement. Exxon believes that if it knew exactly how Black Beauty and PSI were going distribute the coal and what the attendant costs would be (*e.g.,* transportation) [2], it then could devel-

2. The Court cannot help but look with some suspicion upon Exxon's argument that it is dumbfounded as to the parameters of the Black Beauty offer. Exxon's predicament does not ap-

op a new Base figure—the only significant competitive dimension in Exxon's view. But this view misconstrues the nature of the Black Beauty offer, which is founded on more than rote calculations involving quantifiable costs. Part of PSI's compensation to Black Beauty under the competitive offer is in return for the inclusion of certain intangible benefits, such as termination rights. If the Black Beauty offer did not contain these terms, its compensation from PSI would likely be lower. *See* Veenstra Testimony, Tr. at 153–54. The implication for Exxon is two-fold. First, the fact that the Black Beauty offer contains certain unspecified cost considerations is of no consequence because the offer is based in part on factors that are not subject to objective evaluation, and second, meeting the competitive offer pursuant to Section 7.03 includes more than merely matching the competitive offer's base, assuming naturally that the third-party competitor would seek to take full advantage of its own market position and compete along more than the base dimension.

20. Pursuant to Section 7.05, Exxon need not modify anything but the Base to "meet" the competitive offer. PSI's interpretation of Section 7.03 that Exxon must match the competitive offer term for term and in kind is incorrect, as this would be contrary to the express meaning of Section 7.05. That Section states that "the purpose and intent of Sections 7.01 to 7.04, inclusive, are only to provide for renegotiation of Base and Exhibit 'A', and neither party shall inject into such negotiations, as a condition of agreement upon a new Price for the coal, any demand or request that other terms and conditions of this Agreement be altered." Because the competitive offer is not limited to base competition, as this is the only interpretation that would allow the third party competitor to bring the full range of its resources to

bear in the marketplace, the meaning of Section 7.03 that Exxon "shall have the right to meet such competitive offer" means that it must be allowed to match the overall value that the competitive offer would confer on PSI. If it chose not to enter into negotiations outside of Article VII, Section 7.03 allows Exxon to offset non-base related concessions in the competitive offer with corresponding reductions in the Base.

21. Nothing in the language of Section 7.03 indicates that Exxon had the right to determine unilaterally whether it had met the competitive offer; based in part from experience with other reopener provisions, the parties recognized the necessity of discussing the competitive offer and making adjustments in their negotiating positions accordingly. *See* Brister Testimony, Tr. at 679; Veenstra Depo. III, at 444–451; Ashley Depo. II, at 206–08.

22. PSI has satisfied Section 7.03's requirement that it furnish Exxon with "documentary proof" of the competitive offer, and "to examine all supporting data and information submitted with the offer." PSI furnished a copy of the Black Beauty offer to Exxon. *See* Veenstra Testimony, Tr. at 88. PSI also gave Exxon copies of the consulting reports that it solicited to verify Black Beauty's ability to fulfill the requirements of its offer. *See* Veenstra Testimony, Tr. at 89.

Exxon contends that it has not been able to substantiate Black Beauty's ability to perform because it has not been given the precise details of Black Beauty's mining operations. Exxon's argument is unreasonable because it contemplates that Section 7.03 can be used to access proprietary information from Exxon's competitors—in this instance Black Beauty. The Court will read the Agreement in a way that renders it reasonable rather than unreasonable. *See, e.g.,*

---

pear dissimilar to the kind of problem that well-managed businesses regularly and successfully confront: how to allocate a scarce resource within constraints that may or may not be precisely known. It strikes this Court that any decent linear programmer should be able to estimate the way in which PSI is likely to allocate optimally the coal from Black Beauty's mines, given such constraints as the nature of the coal at each mine, and the tonnages that can be burned at

each PSI station with the specified $SO_2$ limits. *See, e.g.,* David R. Anderson, Dennis J. Sweeney, and Thomas A. Williams, Quantitative Methods for Business Analysis (4th ed. 1989). The only offer that Exxon appears willing to examine pursuant to Section 7.03 is one which has every cost, including future costs, precisely identified. The Court will not endorse such a rigid and unrealistic interpretation of that section.

*South Bend v. Blue Lines, Inc.*, 219 Ind. 462, 38 N.E.2d 573, 575 (1942). Section 7.03 is not a license to conduct industrial espionage. The language in question instead is designed to prevent PSI from soliciting sham offers and using the reopener as a means to escape from the Agreement. The competitive offer must be one that Exxon "is willing to accept", and the documentation that Exxon is entitled to must afford it the opportunity to verify that the competitive offer is one that PSI reasonably could be expected to accept. The Black Beauty offer, and the reports of the consultants that PSI engaged to evaluate it, *supra*, were sufficient to meet the documentation requirements of Section 7.03.

23. Section 7.03 of the Agreement gives Exxon the right to meet the competitive offer.

24. Exxon has not met the Black Beauty offer. The cost to PSI to purchase coal furnished pursuant to the Black Beauty offer is less than the Exxon offer of $23.266 per ton. *See* Plaintiff's Exhibit 61; Veenstra Testimony, Tr. at 101–105. This comparison is independent of the additional flexibility which the Black Beauty offer affords to PSI, (*see, e.g.*, price renegotiation, force majeure, performance limitations, and termination rights provisions), which further highlights the failings in Exxon's bid.

25. The Agreement shall terminate on December 31, 1992, or at PSI's election, at the end of the temporary continuance of deliveries as provided for in Section 7.04.

### CONCLUSION

For the forgoing reasons, the Court GRANTS the Plaintiff's request for a declaratory judgment that: (1) the written offer which PSI Energy Inc. has received from the Black Beauty Coal Company is a competitive offer within the meaning of the Agreement; (2) Exxon did not meet the competitive offer submitted to it, on or before 5:00 p.m., Houston time, July 3, 1992; and (3) the Agreement shall terminate on December 31, 1992, or at PSI's election, at the end of the temporary continuance of deliveries as provided for in Section 7.04 of the Agreement.

It is so ORDERED.

### AMENDED ENTRY NUNC PRO TUNC

On December 28, 1992, the Court issued its Entry and Judgment in the above named action. The parties have since moved the Court to amend the Entry and Judgment by: (1) expressly granting or denying the relief requested in Exxon Coal's Amended Counterclaim; (2) expressly granting or denying PSI's request for a declaration that Exxon be enjoined from taking or seeking any action, at law, in equity, or otherwise, to prevent PSI Energy from accepting and executing a new agreement for the supply of coal under the Agreement; and (3) changing the Entry at page 23, line 19 to read "The competitive offer must be one that PSI is 'willing to accept' ..." *See Joint Motion for Amended Judgment and Amended Entry*, at ¶ 6. The parties also advise the Court that, contrary to what is stated in footnote one (1) of the Court's Entry, they "did not intend, by their stipulation, to limit the issues for decision and intended for the Court to proceed to rule on all issues presented by the Complaint and Amended Counterclaim. The stipulation was intended only to obviate the necessity of filing any further claims or pleadings." *Id.* at ¶ 3.

Having considered the parties' requests, the Court hereby amends its Entry as follows: [Editor's Note: The amendments have been incorporated for purposes of publication]

(1) Footnote one (1) on page two (2) of the Entry is deleted;

(2) Lines 18–19 on page 23 of the Entry are amended to read: "The competitive offer must be one that PSI is 'willing to accept' ...";

(3) The following language is added to the end of the single paragraph appearing on page 25 of the Entry: "The relief requested in Exxon's Amended Counterclaim is DENIED. PSI's request for a declaration that Exxon is prohibited from taking any action, at law, in equity, or otherwise, from enjoining or preventing or seeking to enjoin or prevent, PSI Energy from accepting and executing a new agreement for the supply of coal under the Agreement is DENIED for the

reason that such relief was not supported by the evidence adduced at trial."[1]

(4) An Amended Judgment shall issue containing the following language: "The relief requested in Exxon's Amended Counterclaim is DENIED. PSI's request for a declaration that Exxon is prohibited from taking any action, at law, in equity, or otherwise, from enjoining or preventing or seeking to enjoin or prevent, PSI Energy from accepting and executing a new agreement for the supply of coal under the Agreement is also DENIED."

It is so ORDERED.

### AMENDED JUDGMENT NUNC PRO TUNC

In accord with the Court's Entry in the above named action, the Court hereby declares that: (1) the written offer which PSI Energy Inc. has received from the Black Beauty Coal Company is a competitive offer within the meaning of the Agreement; (2) Exxon did not meet the competitive offer submitted to it, on or before 5:00 p.m., Houston time, July 3, 1992; and (3) the Agreement shall terminate on December 31, 1992, or at PSI's election, at the end of the temporary continuance of deliveries as provided for in Section 7.04 of the Agreement The relief requested in Exxon's Amended Counterclaim is DENIED. PSI's request for a declaration that Exxon is prohibited from taking any action, at law, in equity, or otherwise, from enjoining or preventing or seeking to enjoin or prevent, PSI Energy from accepting and executing a new agreement for the supply of coal under the Agreement is also DENIED.

It is so ORDERED.

---

1. Any interference with or violation of the Court's Judgment, as amended, would, of course, be actionable as contempt, however.