659 P.2d 1334

**Jerome M. CAIN and Ludmilla S. Cain, husband and wife, Plaintiffs-Appellants,**

v.

**AETNA LIFE INSURANCE CO., a Connecticut corporation; William C. Menge and Jane Doe Menge, husband and wife; and John Doe, Defendants-Appellees.**

**No. 1 CA–CIV 5576.**

Court of Appeals of Arizona, Division 1, Department A.

Jan. 27, 1983.

Patten, Montague & Arnett by Wayne C. Arnett, Tempe, for appellants.

Black, Robertshaw & Copple, P.C. by John N. Norris and Jon R. Pozgay, Phoenix, for appellees.

OPINION

MEYERSON, Judge.

In this appeal from summary judgment entered in favor of Aetna Life Insurance Company (Aetna), we are called upon to decide whether a contract for temporary insurance existed between the parties. The record before us reveals the following facts.

## I. FACTS

Plaintiff-appellant Jerome M. Cain (Cain) was employed by the Keystone Machine Company (Keystone). The company's owner, Donald L. Shurwin, desired to obtain group health insurance for his employees. He contacted Marita Greene, an independent insurance agent, who represented a number of insurance companies, including Aetna. Ms. Greene and an Aetna representative went to Keystone and met with Mr. Shurwin.

Shurwin filled out the application for group health insurance and gave the Aetna representative a check for the initial premium. Although apparently nothing was expressly said by the Aetna representative or Ms. Greene that the insurance would begin immediately, Shurwin stated in his deposition that he was left with the clear impression that coverage would begin at once. In return for his check for the first month's premium, Shurwin was given a "receipt for advance payment." The Aetna agent and Ms. Greene then went into the shop area and obtained individual enrollment forms from Shurwin's employees including Cain, who also applied for dependent coverage. These forms, as well as the group application form filled out by Shurwin, were dated November 2, 1977. Shortly thereafter, Shurwin told his employees that the insurance was in effect and he would begin withholding a portion of their paychecks for the insurance premium.

The applications were received at Aetna's home office in Connecticut on November 10, 1977. On approximately November 17, the applications were pre-processed—medical reports from a bureau used by insurance carriers were received on each of the employees. On November 23, the applications were sent to the Aetna underwriter to make the decision whether to provide coverage.

During this same time, Cain's wife required emergency treatment and on November 21, she had surgery to remove her gall bladder. It was her claim for benefits under the policy which gave rise to the litigation.

Upon reviewing Cain's application on November 23, Ann Wicks, the Aetna underwriter, noticed that the bureau report on Cain indicated that he had been treated for rheumatoid arthritis. Ms. Wicks telexed Aetna's field office in Phoenix requesting more information from Cain. The Phoenix office did not respond in a timely manner so Ms. Wicks sent a telex on December 5 and again on December 15. On December 16, after talking with Cain, the Phoenix office contacted Ms. Wicks by phone and informed her that he had been treated for swollen ankles due to long hours on the job; Cain reported that he was no longer troubled by these conditions.

Ms. Wicks referred Cain's application to a physician in Aetna's medical department. The Aetna physician recommended that a statement be obtained from the physician who treated Cain for the supposed arthritis. Wicks telexed the Phoenix field office on December 23 requesting such a statement. The treating physician's statement was not received in Connecticut until January 24, 1978, and the report listed as a diagnosis, "possible rheumatoid disease."[1] On Febru-

---

1. In his enrollment form, Cain failed to disclose that he had been treated by a physician in the last five years. Aetna contends that his application would have been processed in a timely fashion had Cain not made this misrepresentation. Cain's misstatement does not affect our conclusion in this case because the question of whether temporary insurance coverage exists is totally separate and independent from the claimed misrepresentation made by Cain. Indeed, the misrepresentation argument is used to demonstrate the reason for delay in processing the application and not to answer Cain's contention that temporary insurance was in effect. Aetna does not contend that Cain's misstatement amounted to misrepresentation

ary 13, Ms. Wicks referred Cain's file back to her consulting physician. The Aetna physician thought that the diagnosis was questionable and that it still might be possible to provide coverage to Cain. He recommended that Cain be given a medical examination.

Marita Greene attempted to contact Cain to arrange a physical examination and learned that he no longer worked at Keystone. Aetna made no further inquiries to locate Cain or to determine his medical condition. When Cain called the Aetna office to inquire about his claim, he was told that Keystone had no health insurance.

Thereafter, Cain and his wife brought this action alleging that (1) the claim for medical benefits should have been paid under a contract for temporary insurance and (2) Aetna's conduct violated its obligation to deal with the Cains fairly and in good faith. Summary judgment was entered in favor of Aetna and this appeal followed.

## II. TEMPORARY INSURANCE [2]

The resolution of the temporary insurance issue turns upon the language of the conditional receipt given to Shurwin in exchange for the payment of the initial premium and the interpretation given such a receipt under previous decisions of this court and the Arizona Supreme Court. The receipt given to Shurwin contained the following statement:

> If the Employer is eligible for the program in accordance with the regular rules

and practices of the Insurance Company, insurance for each eligible person shall become effective on the date of this receipt or on the date of his individual enrollment if later, subject to the provisions of the policy, but only if the Insurance Company shall be satisfied that on such effective date the eligible person (and his covered dependents, if any) are insurable as standard risks in accordance with the regular rules and practices of the Company for the amounts of benefits applied for. If the sum paid is less than the first premium under the policy, insurance shall continue for only such portion of a month as the sum paid will purchase on a pro rata basis unless the remainder of the first premium shall be paid within 60 days from date hereof. If the Company declines to underwrite the program to include the Employers [sic], the sum will be returned to the Employer. If the Insurance Company declines to approve insurance on any individual, the part of the sum applicable to the said individual will be returned to the Employer.

We must decide whether the payment of the initial premium with the group application and individual employee enrollment forms created a temporary insurance contract by virtue of the foregoing language.[3] To resolve this question, we turn to applicable Arizona cases.

In *Turner v. Worth Insurance Co.,* 106 Ariz. 132, 472 P.2d 1 (1970), the supreme

---

within the meaning of A.R.S. § 20–1109. Additionally, when Cain was re-employed by Keystone in April he was covered under a *new* Aetna policy.

**2.** At one point in his opening brief, Cain argues that the conditional receipt created a "binder." Aetna contends that Cain never raised the binder argument below and is therefore precluded from raising it on appeal. Although Cain used the term binder, his argument on appeal, as it was below, is that a contract of temporary insurance was created by virtue of the payment of the premium and delivery of the receipt. Aetna's contention is without merit.

We note, however, that A.R.S. § 20–1120, which provides guidelines for binders and temporary insurance contracts, does not apply to

health insurance. *Continental Life & Accident Co. v. Songer,* 124 Ariz. 294, 299, 603 P.2d 921, 926 (1979). A contract for temporary insurance can arise, however, independent of the statute. *Id.* Additionally, this is not a case of whether a binder (written or oral) for temporary insurance was issued. Rather, the issue here is whether the payment of the initial premium and delivery of a conditional receipt for "permanent" insurance gives rise to a contract for temporary insurance.

**3.** The issue of temporary insurance has been the subject of extensive litigation. Annot. 2 A.L.R.2d 943 (1948); *see* 12A Appleman, Insurance Law and Practice §§ 7237–44 (1943); 1 Couch on Insurance 2d §§ 14:39–46 (1959 & Supp.1982).

court held that a receipt evidencing partial payment for an automobile liability insurance policy constituted a written contract for temporary insurance. The court found that the receipt set forth the material terms of a contract of insurance—consideration, acceptance by the insurance agency, identification of the nature of the policy, and an acknowledgment by the insurance agent. The court also found that it was the intent of the insured, as well as of the insurance agent, that coverage would begin from the time of the making of the partial payment. The insurance company argued that it was its intent to cover the insured from the date of the application upon the condition that the company would subsequently accept the risk and issue its policy retroactively to the date of application. The court looked with disfavor upon that rationale noting that "such a rule would permit an insurer to hold itself immune from liability during the period while it considers whether to accept or reject the application, and then, if it accepts the risk, to assess a premium for the time that it was not obliged to assume liability." *Id.* at 136, 472 P.2d at 5.

In *Roscoe v. Bankers Life Insurance Co.,* 22 Ariz.App. 282, 526 P.2d 1080 (1974), this court held that the failure of the insured to complete a medical examination required under the terms of an application for a life insurance policy barred recovery where the applicant for insurance was killed approximately one and one-half months after the application was submitted. The court found specific and nonsubjective conditions precedent to coverage and held that "where a physical examination and physician's medical questionnaire is required . . . the applicant must arrange for these to be furnished to the company before his application is completed and before coverage can arise." *Id.* at 285–86, 526 P.2d at 1083–84.

In *John Hancock Mutual Life Insurance Co. v. McNeill,* 27 Ariz.App. 502, 556 P.2d 803 (1976), this court found that an insur-

able risk type of conditional receipt can give rise to a temporary contract of insurance, even in the absence of the issuance of an insurance policy, provided that "objective" conditions precedent to such coverage are met. In *McNeill,* the court found three conditions precedent to effectuating temporary coverage—the payment of one month's premium, a medical examination, and a finding by the insurance company that the applicant was acceptable under its rules.

Mr. McNeill complied with the first two conditions but was found unacceptable by the company because of his personal habits—a drinking problem and a recent conviction for driving while intoxicated. The court found that the last condition was subjective and that the "company's rules did not disclose to Mr. McNeill whether he was insurable at all or whether his premium will be that stated to him or an increased premium, or whether coverage different from that applied for would be offered by the company, these determinations being locked in the subjective judgment of an underwriter." *Id.* at 507, 556 P.2d at 808.

> Certainly the undisclosed, unascertainable subjective workings of an underwriter's mind, cannot be objectively ascertained by the applicant for the purpose of having such a determination be a condition precedent to the effective date of the coverage afforded under the conditional receipt.

*Id.* The court held that a condition precedent to effectuating temporary coverage must be one which can be "objectively determine[d] from the face of the contracting document . . . ." *Id.*

Several principles emerge from the foregoing authorities. In an insurable risk type of conditional receipt, such as we have here,[4] a temporary contract of insurance can arise even absent the issuance of an insurance policy, provided the conditions precedent to such coverage are met. Such

---

**4.** An insurable risk conditional receipt is one in which insurance takes effect at the time of payment (or of the physical examination) if it later appears that the applicant was insurable at the date in question according to the compa-

ny's standards. *McNeill,* 27 Ariz.App. at 505, 556 P.2d at 806. The parties agree that the receipt at issue here is an insurable risk type of receipt.

conditions, however, must be objective and must be ascertainable by the applicant for insurance. Noncompliance with a condition which requires the applicant to delve into the "subjective workings of an underwriter's mind," *McNeill*, 27 Ariz.App. at 507, 556 P.2d at 808, will not prevent a contract for temporary insurance from coming into effect.

■ We find the terms of this conditional receipt to be subjective. Insurance coverage is to be retroactive to the date of the conditional receipt (or the date of enrollment if later) "if the insurance company shall be satisfied that on such effective date the eligible person (and his covered dependents, if any) are insurable as standard risks in accordance with the regular rules and practices of the Company for the amount of benefits applied for." We find this condition to be subjective because the applicant for insurance is not capable of ascertaining with any degree of certainty whether he or she is insurable as a standard risk in accordance with the regular rules and practices of the insurance company.[5]

Our conclusion is borne out by the facts in this case. In its answers to Cain's interrogatories, Aetna stated that it had no underwriting manual detailing its practices or policies with regard to accepting or rejecting applications for the type of policy at issue herein. The Aetna underwriter testified in her deposition that when she received Cain's physician statement she referred the file back to an Aetna physician and when asked whether there was something in her medical manual that would tell her to refer the matter back to the physician she stated no, it was just a decision which she made. The determination of whether an attending physician's statement

is required also is not subject to any rule or guideline. The underwriter testified in her deposition as follows:

Q. I see. The requirements are entirely up to you?

A. Yes.

Q. You look at it and say, "I want an APS [attending physician's statement] or I don't want one," or, "I want an examination or I don't want one."

A. That's correct.

Q. And that's it?

A. Yes.

Q. Entirely at your discretion?

A. And the doctor's.

Exhibit 1 to Ms. Wicks' deposition was a page from Aetna's medical manual concerning arthritis and related disorders. It was used to evaluate the medical condition of an applicant with arthritis. Ms. Wicks was asked as follows:

Q. Now, are you bound by these guidelines that are in Exhibit One?

A. No.

Q. What you described earlier today, it being within your discretion is true, isn't it?

A. Yes.

Q. These are simply guidelines so that there will be some uniformity among underwriters, is that correct?

A. That is correct, yes.

Aetna's practice highlights the inherent subjectiveness of the language contained in the conditional receipt.[6] The determination of whether Cain was insurable as standard risk in accordance with Aetna's rules and practices was a matter left totally up to the discretion of the underwriter. Unquestionably, there was no way that it could have been determined from the language of the

---

**5.** We recognize that our holding would apply to any conditional receipt with language similar to that at issue here. We expressly limit, however, the rule we adopt herein to contracts for group health insurance.

**6.** Similar language has been held to be "objective." *Grandpre v. Northwestern Nat'l Life Ins. Co.*, 261 N.W.2d 804 (S.D.1977). The court in *Grandpre* stated that the "objective standard of insurability" is the "company's own standard

for the plan ...." *Id.* at 808. But absent the contemporaneous disclosure of standards of insurability to the applicant, we fail to see how the potential insured can "objectively determine from the face of the contracting document," *McNeill*, 27 Ariz.App. at 507, 556 P.2d at 808, whether he has complied or can comply with the precise conditions precedent to coverage.

conditional receipt whether or not Cain was insurable as a standard risk. We therefore conclude that the receipt contained a subjective condition precedent to coverage which may not be asserted to preclude temporary insurance in this case.[7]

Additionally, because the receipt was ambiguous we construe it against Aetna and find that temporary coverage existed. The conditional receipt stated as follows. "If the sum paid is less than the first premium under the policy, insurance shall continue for only such portion of the month as the sum paid will purchase on a pro rata basis unless the remainder of the first premium shall be paid within 60 days from date hereof." Because an applicant for insurance could have reasonably concluded that the payment of a partial premium would immediately institute coverage on a pro rata basis for a portion of the first month, an ambiguity is created with respect to the effect of paying a full month's premium. Because this language is ambiguous, it must be construed against the insurance company. *Parks v. American Cas. Co.,* 117 Ariz. 339, 341, 572 P.2d 801, 803 (1977). "[I]nsurers who seek to impose upon words of common speech an esoteric significance intelligible only to their craft, must bear the burden of any resulting confusion." *Gaunt v. John Hancock Mutual Life Ins. Co.,* 160 F.2d 599, 602 (2d Cir.1947) (Hand, J.).

We recognize that many conditional receipts used in the insurance industry make coverage effective retroactively upon a subsequent determination by the insurance company that the applicant for insurance meets the standards of insurability according to the company's rules, regulations, or practices. This determination is a necessary and essential function for the in-

surance company to perform. Our holding merely reflects what we believe to be the reasonable expectation of the applicant for group health insurance under circumstances such as are present in this case. *See Collister v. Nationwide Life Ins. Co.,* 479 Pa. 579, 594, 388 A.2d 1346, 1354 (1978), *cert. denied,* 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979). If an insurance company seeks to avoid temporary insurance coverage, it may do so by not accepting the initial premium or by including clear and unequivocal language in the conditional receipt stating its intention to condition liability upon subsequent approval of the application for insurance. *Puritan Life Ins. Co. v. Guess,* 598 P.2d 900, 906 (Alaska 1979).

The drafting of the conditional receipt is in the hands of the insurance company and it should not be able to rely on ambiguous language which might be calculated to induce payment of an advance premium. *See Simses v. North American Co. for Life & Health Ins.,* 175 Conn. 77, 85, 394 A.2d 710, 714 (1978). Absent a clear warning that coverage is not to begin at once, we believe that the applicant for group health insurance who pays an initial premium at the time he applies for the insurance, has a reasonable expectation of at least temporary insurance coverage. This is particularly true where a conditional receipt contains language which is susceptible to the interpretation that coverage is to be provided immediately.[8]

By collecting an advance premium and withholding a determination of insurability, the insurance company receives an obvious advantage by not only having the use of the insured's money but also, in effect, holding itself immune from liability while it considers whether or not to provide coverage. *Turner v. Worth Ins. Co.,* 106 Ariz. at 136,

---

7. Because we hold that temporary insurance was in effect during the time of Mrs. Cain's surgery, we do not reach Cain's argument that summary judgment was improvidently granted because Aetna failed to make a determination with respect to his insurability.

8. Aetna argues that it is "beyond the wildest stretch of imagination" that Cain would not realize that his medical history was a condition precedent to coverage. Certainly, Cain could have expected that the issuance of a health insurance policy would be conditioned upon an examination of his medical history. The question, however, is whether pursuant to the terms of this conditional receipt, temporary coverage existed.

472 P.2d at 5. On the other hand, if the application is subsequently accepted, the insurance company is able to earn premiums from the earliest possible date.

Our holding is particularly warranted in the context of a group health insurance policy. Typically, the policy is negotiated by the employer with limited opportunity for employee participation. Employee applications or enrollment forms are frequently filled out and collected during working hours with little chance for careful scrutiny by the individual employee. In this case, for example, Keystone's employees were all called together and told to "fill them [the applications] out." No explanation of coverage was provided nor did Ms. Greene or the Aetna agent distribute any explanatory materials to Shurwin's employees.[9] Furthermore, uncertainty with respect to the initial date of coverage could work a severe hardship on unsuspecting employees. For example, in this case, because of the problem in processing Cain's application, the entire group went without coverage until March, 1978. Imagine the injustice to other eligible employees who may have applied for benefits only to find they had no coverage.[10]

### III. BAD FAITH

■ We now turn to Cain's claim for bad faith. Cain's complaint, in addition to the count regarding temporary insurance, alleged that Aetna's actions were in bad faith and violated its duty of fair dealing. The summary judgment entered against Cain was broadly framed and extended to Cain's claim for bad faith dealing. Indisputably, a claim for bad faith dealing on the part of an insurance company exists in Arizona. *Noble v. National American Life Ins. Co.,* 128 Ariz. 188, 624 P.2d 866 (1981) (bad faith

refusal to pay claim); *Continental Life and Accident Co. v. Songer,* 124 Ariz. 294, 603 P.2d 921 (Ct.App.1979) (duty to act upon application for insurance within reasonable period of time). Aetna's argument below was that no bad faith claim could exist unless there was temporary insurance coverage. Having found that a contract for temporary insurance existed, we find that it was error for the trial judge to grant summary judgment against Cain on his bad faith claim.

Accordingly, the summary judgment against Cain is reversed. This matter is remanded to the trial court for proceedings consistent with this opinion.

JACK L. OGG, P.J., and CORCORAN, J., concur.

---

9. Because a group health insurer has a duty to "furnish to the policyholder, for delivery to each employee . . . an individual certificate setting forth . . . the essential features of the insurance coverage," A.R.S. § 20–1402.2 (Supp. 1982), Cain's failure to see the conditional receipt given to Shurwin does not affect our decision.

10. Although the receipt appears to provide that disqualification of one employee does not preclude insurance for the group, Aetna's underwriter testified in her deposition that the company had the discretion to provide coverage (or not to provide coverage) depending upon the evaluation of the "health" of the group as a whole. This was substantiated by Aetna's counsel at oral argument.