886 P.2d 1381

**Anna Mae ANDERSON, individually a widow, and Anna Mae Anderson, as Personal Representative of the Estate of Roger Anderson, deceased, Plaintiff–Appellant,**

v.

**COUNTRY LIFE INSURANCE COMPANY; Donald Fitzgerald and Jane Doe Fitzgerald, Defendants–Appellees.**

No. 1 CA–CV 93–0181.

Court of Appeals of Arizona, Division 1, Department E.

Nov. 17, 1994.

Reconsideration Denied Jan. 11, 1995.

---

Arnett & Arnett by Wayne C. Arnett, Mark W. Arnett, Tempe, for plaintiff-appellant.

Thomas, Burke & Phillips, P.C. by Thomas P. Burke II, Phoenix, for defendants-appellees.

## OPINION

TOCI, Judge.

Anna Mae Anderson, individually and as personal representative of the estate of her husband, Roger Anderson, appeals the trial court's grant of summary judgment in favor of Country Life Insurance Company ("Country Life").

This appeal presents the following issue: may an insurer who accepts advance premiums and issues a written receipt for health insurance coverage effective immediately, conditioned upon the later issuance of a policy of insurance, defeat interim coverage by refusing to issue the policy after a loss occurs?

The answer is no. We conclude that a conditional receipt of this nature is illusory, unconscionable, and against public policy. An insurer may not collect a premium for a period during which it had no risk. Consequently, when Country Life accepted a premium from the Andersons for immediate coverage, a contract for interim insurance was created notwithstanding the condition in the receipt giving Country Life the power to defeat such coverage by not issuing a policy of insurance. Thus, we reverse the summary judgment in favor of Country Life and remand with directions that judgment be entered in favor of the Andersons on this issue.

We also dispose of two additional issues. First, we conclude that the Andersons' failure to submit a claim does not preclude recovery where the insurer indicated that no coverage existed. Second, we conclude that, because the Andersons' policy was not an "insurable risk" type of policy, Country Life did not condition insurance on Mr. Anderson's health at the time of application.

Country Life was, therefore, under no duty to continue processing Mr. Anderson's application once Country Life determined that it would not issue a policy. We therefore affirm summary judgment for Country Life on Mrs. Anderson's claim of insurance bad faith.

## I. FACTS AND PROCEDURAL HISTORY

[1, 2] In reviewing the ruling on a motion for summary judgment, we are not bound by any issues of law decided by the trial court and will determine such issues anew. *See Gary Outdoor Advertising Co. v. Sun Lodge, Inc.*, 133 Ariz. 240, 242, 650 P.2d 1222, 1224 (1982). Furthermore, where the issues can be decided as a matter of law, we have the authority both to vacate the trial court's grant of summary judgment in favor of one party and to enter summary judgment for the other party if appropriate. *McCallister Co. v. Kastella*, 170 Ariz. 455, 457, 825 P.2d 980, 982 (App.1982); *Roosevelt Sav. Bank of New York v. State Farm Fire & Casualty Co.*, 27 Ariz.App. 522, 526, 556 P.2d 823, 827 (1976); *see also Trimmer v. Ludtke*, 105 Ariz. 260, 263, 462 P.2d 809, 812 (1969). In exercising our authority to enter summary judgment in favor of the nonmoving party, the Andersons, on the issue of interim health benefits, we view the following facts and all inferences therefrom in a light most favorable to Country Life. *Cf. Cecil Lawter Real Estate Sch., Inc. v. Town & Country Shopping Ctr. Co.*, 143 Ariz. 527, 533, 694 P.2d 815, 821 (App.1984).

On November 26, 1990, Country Life's agent, Donald Fitzgerald, met with the Andersons at their home to obtain their application for health insurance. The Andersons filled out an application, and Mrs. Anderson wrote a personal check in the amount of $1,616.93 to Country Life for a six-month premium for both the Andersons. Fitzgerald accepted the check and completed the application. During the meeting, Fitzgerald gave the Andersons a "conditional receipt for medical policy," which he dated that same day.[1] Fitzgerald specifically pointed out to Mr. Anderson that the policy would not become effective until all conditions were met and the company approved the issuance of a policy.[2] Fitzgerald said that after reading the conditional receipt, Mr. Anderson indicated that he understood the significance of the document and considered its use standard procedure for issuance of the policies.

After the meeting, Country Life proceeded with the Andersons' application. Country Life cashed the Andersons' premium check on or about December 4, 1990, and the Andersons received a copy of the canceled check. On December 7, 1990, Country Life notified Fitzgerald that the company required additional information. Country Life wanted medical examinations of both Mr. and Mrs. Anderson. It also requested some additional medical history for Mr. Anderson. Finally, it indicated that, even without a medical examination, Mrs. Anderson would require a 75 percent rate increase because of her stated height and weight. Fitzgerald relayed this information to the Andersons on December 14, 1990, and asked them to schedule the medical examinations.

The very next morning, on December 15, 1990, Mr. Anderson suffered a heart attack and was hospitalized. Mrs. Anderson contacted Fitzgerald the following day to notify him of these events and to obtain assurance that they would have health coverage for his medical bills. Fitzgerald told her he could

---

1. The precise wording of the conditional receipt is reproduced in the Appendix.

2. Mrs. Anderson argues that even if no coverage is provided under the conditional receipt, coverage must be provided based on the oral representations of Mr. Fitzgerald that the insurance would be effective from the day of application. Because we conclude, viewing the facts and inferences in a light most favorable to Country Life, that for public policy reasons temporary coverage exists, no factual determination is necessary on this point. *Cf. Services Holding Co. v. Transamerica Occidental Life Ins. Co.*, 180 Ariz. 198, 883 P.2d 435 (App.1994) (reversing summary judgment for insurer because insurer's representations raised factual issue of whether insured had reasonable expectation of coverage).

not confirm coverage and would need to contact the home office.

Before the home office responded, local processing of the application continued. Shortly after December 15, 1990, Mrs. Anderson was visited by Dr. Potoch, a medical examiner, who took urine samples and provided certain paperwork for Mrs. Anderson's signature. On December 20, 1990, Fitzgerald visited the Andersons in Mr. Anderson's hospital room. Fitzgerald had Mr. Anderson complete and sign a form regarding additional medical history.

In the evening of December 20, 1990, Mr. Anderson died from an aneurysm. The following day, before County Life learned of his death, it sent a letter addressed to Mr. Anderson refunding his portion of the advance premium on the policy. The letter stated that Mr. Anderson's heart attack prevented normal processing procedures on his behalf. The letter also stated, however, that processing of the application could continue on behalf of Mrs. Anderson if she had the required medical examination and paid the 75 percent rate increase previously mentioned.

Several months later, Fitzgerald visited Mrs. Anderson at her home. He brought with him three application amendments requiring her signature to secure her policy. Mrs. Anderson signed amendments increasing her premium rates because of her weight and clarifying her answer to a question on the original application. A third proposed amendment provided for the exclusion of Mr. Anderson from the original policy application. Mrs. Anderson refused to sign this amendment, telling Fitzgerald that her husband "was never on the policy, so why should I sign?" Country Life then discontinued processing Mrs. Anderson's application and refunded the balance of the premiums paid.

Mrs. Anderson filed suit against Country Life. She alleged, among other things, breach of contract and breach of the duty of good faith and fair dealing. Country Life moved for summary judgment on all claims. It argued that no contract of insurance was ever formed because the conditional receipt required that Mr. Anderson take a medical exam and that a policy be issued prior to insurance becoming effective. Country Life additionally argued that there was no evidence of bad faith on its part. Granting the summary judgment, the trial court summarized its reasoning as follows:

> It is the opinion of the Court that the language in the conditional receipt in this case to the effect that "there is no coverage—unless a policy is issued" is clear and unequivocal. The conditional receipt also contains bold type language that the agent is not authorized to "alter, waive or otherwise change the conditions of this receipt."

## II.  DISCUSSION

### A.  Background

To obtain some measure of protection against the applicant's withdrawal of his offer during the investigation into insurability, insurers have conceived the idea of issuing what is known as a binding receipt. *See* 12A John Alan Appleman & Jean Appleman, *Insurance Law and Practice* § 7237, at 188 (1981). These binding receipts, or conditional receipts, as they are sometimes called, are issued with the payment of the first premium. *Id.* What the insurers "generally seek to do is make interim coverage depend upon their approval of the application, or a finding that the applicant was insurable at the time the application is made." *Id.* at 189. The exact language of these provisions varies greatly.

The issuance of a conditional receipt improves the insurer's position in several ways. First, it does away with the disadvantage to the insurer of the applicant changing his mind after the insurer has incurred the cost of determining if the applicant is an insurable risk. The applicant to whom a binding receipt has been issued feels, as a rule, contractually obligated to perform. Second, the issuance of a conditional receipt gives the insurer the use of the premium money at the earliest date possible. *Powell v. Republic Nat'l Life Ins. Co.*, 337 So.2d 1291, 1297 (Ala.1976).

Conditional receipts have been the subject of extensive litigation and commentary. *See generally* 12A Appleman §§ 7237–7244; C.T. Drechsler, Annotation, *Temporary Life, Accident, or Health Insurance Pending Approval of Application or Issuance of Policy*, 2 A.L.R.2d 943 (1948); George J. Couch, *Cyclopedia of Insurance Law* §§ 14.1–14.46 (1984). Although there are several types of conditional receipts, for the purposes of this discussion we consider only two. The first type is the "approval" conditional receipt. In approval conditional receipts, the insurer requires advance payment of premiums but conditions temporary insurance on the issuance of a permanent policy of insurance. *See* 12A Appleman § 7238, at 201. In this case, Country Life's receipt is an approval conditional receipt.

A second type of condition frequently encountered in written receipts is the "insurable risk" condition. The condition precedent to coverage is that the insurer examine the information furnished by the insured and make a determination, under the insurer's customary underwriting standards, that the applicant is insurable. Under such a provision, an insurer is only liable for losses incurred during the interim period if it is later determined that the applicant was an insurable risk *at the time of application*. *See generally* 12A Appleman § 7239. The insurable risk conditional receipt benefits the insured because "it protects him against a change in his physical condition between the date of the issuance of the 'receipt' and the date when his completed application is accepted by the company." *Roscoe v. Bankers Life Ins. Co. of Nebraska*, 22 Ariz.App. 282, 285, 526 P.2d 1080, 1083 (1974).

## B. Analysis

### 1. Country Life's Conditional Receipt

Against the above backdrop, we turn to the issue at hand: did the conditional receipt issued to the Andersons preclude temporary coverage merely because Country Life did not issue a policy? Mrs. Anderson asserts that public policy prohibits an insurer from taking an advance premium and placing conditions in the receipt so that it incurs no risk during the interim period for which it retains the premium. We agree. Although we do not rest our decision upon an ambiguity in the policy, we note that the rule we announce is particularly applicable where, as here, the policy can be read as providing coverage immediately.

We begin our analysis on this point by observing that approval conditional receipts have been severely criticized. *See* 12A Appleman §§ 7238, 7243. Because an insurer can merely disapprove an application if a loss occurs during the interim, no real benefit is extended to the insured for his advance payment of the premium. *Id.* In other words, unlike an insurable risk conditional receipt, where the insured is protected against interim adverse health changes if he is insurable at the time of application, approval conditional receipts provide the insured no protection whatever against such hazards. Thus, a receipt for insurance coverage that purportedly makes coverage effective immediately, but also contains an approval condition, renders the insurer's assumption of risk illusory. See Restatement (Second) Of Contracts § 76 cmt. d (1981) ("Words of promise do not constitute a promise if they make performance entirely optional with the purported promisor.").

Not only are approval conditional receipts illusory, they also create an incentive for the insurer to delay processing of an application. If a policy is later issued, the advance premium is charged from the date of application anyway. If the insurer ultimately denies the application, any delay in processing will be to the insurer's benefit because it collects and retains the interest on the applicant's deposit. *See* 12A Appleman § 7241, at 230.

Arizona courts have considered the effect of conditional receipts in the context of automobile insurance. In *Turner v. Worth Insurance Co.*, 106 Ariz. 132, 133, 472 P.2d 1, 2 (1970), an application for automobile insurance provided that "no coverage is in effect

until a binder in writing or a policy is issued...." The applicant for insurance filled out the application, gave the agent a check, and received a written receipt. Six days later he was involved in an accident. Soon after, the insurer notified the applicant it would not issue a policy. Although the agent testified that immediate coverage was intended, the insurer argued that immediate coverage was offered only "on the condition that Worth would subsequently accept the risk and issue its policy retroactive to such date." *Id.* at 136, 472 P.2d at 5.

In *Turner*, the supreme court noted that there were conflicting theories on this subject. According to that court, a number of decisions have held that "no contract of insurance exists until the insurer has been satisfied as to an applicant's acceptability." *Id.* (quoting *McAvoy Vitrified Brick Co. v. North Am. Life Assurance Co.*, 395 Pa. 75, 149 A.2d 42, 48 (1959)). Under that view, the "provisions that the insurance shall be in force from the date of the application means that, if and when the company is satisfied, the contract shall be considered to relate back and take effect as of that date." *Id.* The court rejected that view, stating that "such a rule would permit an insurer to hold itself immune from liability during the period while it considers whether to accept or reject the application, and then, if it accepts the risk, to assess a premium for the time that it was not obliged to assume liability." *Id.; see also Statewide Ins. Corp. v. Dewar*, 143 Ariz. 553, 556, 694 P.2d 1167, 1170 (1984) ("As a matter of public policy ... the insurer is not allowed to make the binder effective only on the condition that the policy is subsequently issued.").

*Turner* and *Dewar* dealt with automobile insurance, which involves different underwriting considerations than health insurance. *Cf. Roscoe*, 22 Ariz.App. at 286, 526 P.2d at 1084; 12A Appleman § 7237. Arguably, an automobile insurer is not adversely affected by a rule that coverage is effective immediately despite language making the policy conditional upon the insurer's approval. As the

insured's losses mount and experience becomes unfavorable, the automobile insurer can protect itself, unless otherwise regulated, by increasing the premium rates.[3] 12A Appleman § 7237, at 187. On the other hand, once a health insurer has undertaken the risk, it is likely bound to perform during the policy term for the stated premium regardless of the insured's loss experience. *Cf. id.* at 188.

Nevertheless, this difference in underwriting considerations between health and automobile insurance is not significant in the context of temporary insurance. Underwriting considerations are critical in the insurer's decision that an applicant is or is not a satisfactory risk for the issuance of a "permanent" policy of insurance. The question presented here, however, is not whether Country Life is "permanently" bound to the Andersons under an issued policy. Rather, we must decide if the Andersons are temporarily insured, that is, insured for the period during which Country Life accepted a premium and considered whether to accept the risk and issue a policy of insurance. In these circumstances, we think the question of the existence of a temporary contract of insurance turns on public policy rather than underwriting considerations.

Thus, we see no valid reason why the holding in *Turner* and *Dewar* should not also apply here to protect an applicant for health insurance. Because health is a fragile commodity, one is at risk while awaiting an insurer's determination of insurability. And, not all insurers make identical determinations on similar facts. 12A Appleman § 7237, p. 188. Some insurers will accept as standard "that which another company will decline; some may accept but charge a larger premium. If the applicant must wait, naked as to coverage, the decision of one company which may be adverse, he hazards his insurability by other companies should his health deteriorate...." *Id.* Consequently, we adopt the rule established in *Turner* and *Dewar* and apply it here.

Our reliance on *Turner* and *Dewar* is bolstered by several cases from other states

---

3.  See Ariz.Rev.Stat.Ann. § 20–263 (1990).

that applied the same rationale in deciding the issue of temporary health insurance coverage. For instance, in *Glarner v. Time Insurance Co.*, 465 N.W.2d 591, 593–94 (Minn.App.1991), the Minnesota Court of Appeals analyzed an approval-type conditional receipt similar to the one at issue here. The court struck certain terms of the receipt as unconscionable because they were illusory in that they allowed the insurer to retain the insured's initial premium without "incurring any liability during the interim period." *Id.* at 595. Likewise, in *Powell*, the Alabama Supreme Court found temporary coverage under an approval-type conditional receipt where the insured paid an initial premium. 337 So.2d at 1300. The court asserted that "[i]t would be *unconscionable* to permit an insurance company, issuing such a receipt and receiving a premium from an applicant ... to say that it had not bound itself to give anything whatever for that portion of the premium...." *Id.* at 1296 (quoting *Western & Southern Life Ins. Co. v. Vale*, 213 Ind. 601, 12 N.E.2d 350, 354 (1938)).

Examining the conditional receipt issued by Country Life in this case, we can find no benefit derived by the Andersons from the portion of the premium that they paid for coverage purportedly effective the date of the application. Country Life has no interim risk unless a policy is issued. Based on Country Life's conduct in this case, it is not likely that Country Life will issue a policy if an interim loss occurs. If no loss had occurred, however, and the policy had issued, Country Life would have been paid a premium for the period from the date of application to the date the policy was issued—a period for which there was no risk to Country Life and no coverage for the Andersons.

Country Life argues that the question of temporary coverage depends strictly on the language of the conditional receipt. We disagree. According to Appleman, examining the language of an instrument only is a "dangerous approach" because "few persons, including lawyers and judges, read their insurance documents; or, if they read them, would understand them." 12A Appleman § 7237,

at 189. Our current law is consistent with Appleman on this point.

■ Since *Darner Motor Sales, Inc. v. Universal Underwriters Insurance Co.*, 140 Ariz. 383, 389, 682 P.2d 388, 394 (1984), we no longer arrive at "artificial results derived from application of ordinary rules of contract construction to insurance policies." Instead, Arizona follows the principle of the "reasonable expectations" of the insured. *Id.* Under the reasonable expectations doctrine, boilerplate policy terms are void if they "cannot be understood by the reasonably intelligent consumer" or if the insurer's actions "create an objective impression of coverage in the mind of a reasonable insured." *Gordinier v. Aetna Casualty & Sur. Co.*, 154 Ariz. 266, 272–73, 742 P.2d 277, 283–84 (1987). Thus, in Arizona today, even clear and unambiguous boilerplate language is ineffective if it either contravenes the insured's reasonable expectations or is unconscionable. *See Broemmer v. Abortion Servs. of Phoenix, Ltd.*, 173 Ariz. 148, 151, 840 P.2d 1013, 1016 (1992).

Even before the *Darner* line of cases, we recognized the principle of reasonable expectations in the context of insurable risk conditional receipts. In *Cain v. Aetna Life Insurance Co.*, 135 Ariz. 189, 194, 659 P.2d 1334, 1339 (App.1983), we observed that noncompliance with a condition that required an applicant to ascertain the subjective calculations of the underwriter "will not prevent a contract for temporary insurance from coming into effect." We also noted that this "is particularly true" where the policy is ambiguous. We said, "Absent a clear warning that coverage is not to begin at once, we believe that the applicant for group health insurance who pays an initial premium at the time he applies for insurance has a reasonable expectation of at least temporary insurance coverage." *Id.* at 195, 659 P.2d at 1340; *accord Collister v. Nationwide Life Ins. Co.*, 479 Pa. 579, 388 A.2d 1346, 1355 (1978). *But cf. John Hancock Mut. Life Ins. Co. v. McNeill*, 27 Ariz.App. 502, 506, 556 P.2d 803, 807 (1976) (premise that upon payment of premium there is reasonable expectation of coverage is

unsupported and has led to questionable results).

*Cain* does not, however, tell us what type of wording constitutes a clear warning. *Cain* does say that an insurer must use "clear and unequivocal language" that it intends "to condition liability upon subsequent approval of the application for insurance." 135 Ariz. at 195, 659 P.2d at 1340. *Collister,* a case upon which *Cain* relied, is instructive on this point:

> [T]he insurer could inform the prospective applicant, *before any money changes hands,* that it does not intend to give the customer anything in return for advance payment, and that the customer is actually paying money now for nothing because no insurance will take effect until approval.... Furthermore, any such notice must be made in a manner calculated to bring the facts of the transaction—that the customer is paying money now, but getting nothing until later—to the customer's attention in no uncertain terms.

388 A.2d at 1355.

■ Country Life argues that the Andersons' conditional receipt contained a clear warning that coverage would not begin at once. This warning, located at the top of Country Life's conditional receipt, stated: "unless each and every condition specified is fulfilled, no insurance will become effective prior to policy delivery." For several reasons, we disagree that this language is sufficient to dispel an applicant's reasonable expectation of immediate coverage.

First, language in the body of Country Life's conditional receipt can be interpreted as providing immediate coverage. Paragraph two provides that the "effective date" of a policy modified by restriction endorsement will be the *"date of application."* Although paragraph five states that "there is no coverage for sickness unless a policy is issued," immediately following it says: *"[C]overage commences* for injury sustained, sickness first manifested or pregnancy commenced *on or after the effective date of the policy as determined in this receipt."* We

conclude that this language, coupled with the statement that the sum paid by the applicant is "payment on the first premium" for medical insurance, could lead one to reasonably believe that coverage begins immediately. Our conclusion is supported by *Wernle v. Country Life Insurance Co.,* 142 Ill.App.3d 145, 96 Ill.Dec. 403, 406, 491 N.E.2d 449, 452 (1986), where, reading a nearly identical conditional receipt, the Illinois Court of Appeals found that the applicant "reasonably could have believed that he [had temporary coverage]."

More importantly, the language in the body of the conditional receipt stating that the effective date of the policy is the date of application gives rise to a reasonable expectation that an intervening adverse health change would not affect insurability. In other words, an applicant could reasonably expect from this language that the conditional receipt was an insurable risk conditional receipt, that is, one in which a policy would issue if the applicant was insurable on the date of the application, notwithstanding a later change in insurability. The conditional receipt, however, does not contain a clear warning that advance payment of the premium does not buy any temporary coverage if the applicant becomes uninsurable following the application for insurance. Applied to this case, we think the "clear warning" required by *Cain* is this: you are paying money now for nothing, because if your health changes to your detriment in the interim, the company will not issue a policy.

Nevertheless, Country Life points out that the conditional receipt gives the applicant the right, at the time of application, to delay the effective date of the policy to the date of issue. Country Life argues that if it had intended to collect unearned premiums for temporary coverage, it would never have placed this language in the conditional receipt. This argument, however, fails to recognize that Country Life did collect an advance premium for immediate coverage while retaining the absolute power to defeat such coverage in the event of an intervening loss.

■ Country Life also argues, and the trial court agreed, that the conditional re-

ceipt provision was an "objective condition," clearly informing any reader that no coverage exists unless a policy issues. In support of this argument, Country Life cites language from *McNeill.* We observe, however, that *McNeill* and other cases that applied the "objective condition" test predated *Darner* and *Gordinier,* the cases that adopted and defined the reasonable expectations doctrine. Under the latter doctrine, boilerplate policy conditions, objective or not, are irrelevant if the insurer's statements or actions gave the insured a reasonable expectation of coverage. Because we conclude that *McNeill* is distinguishable from this case, however, we need not determine if it still is viable after *Darner* and its progeny.

The conditional receipt in *McNeill* was of the insurable risk type. This type of conditional receipt provides some benefit to the insured for paying his money in advance. The applicant obtains the "freezing" of the applicant's health status at a certain date, which is usually the date of application, and the determination of insurability on that date must, at least in Arizona, be based on objective standards. By contrast, where temporary coverage is purportedly dependent upon the insurer's issuance of a policy, as here, the applicant's insurability as of the date of application is not material.

Nevertheless, *McNeill* supports the result we reach in this case. There, temporary coverage was subject to the condition that the applicant be "acceptable under the Company's rules." 27 Ariz.App. at 504, 556 P.2d at 805. The court found that condition to be subjective and, thus, unenforceable. *Id.* at 507, 556 P.2d at 808. The court reasoned that the "subjective workings of an underwriter's mind cannot be objectively ascertained by the applicant for the purpose of having such a determination be a condition precedent to the effective date of the coverage...." *Id.*

Here, temporary coverage was subject to the condition that a policy be issued. Because the decision to issue a policy is completely within Country Life's discretion, that condition is virtually the same as the *McNeill* condition that the applicant be "acceptable" to the company. *McNeill,* therefore, implicitly refutes Country Life's argument that, by merely reserving the right to do so, an insurer may escape the requirement that it divest itself of the power to defeat temporary coverage after a loss occurs.

Finally, Country Life argues against the rule requiring objective conditions in conditional receipts. It contends that this approach destroys the utility of conditional receipts because no conditional receipt can explain in purely objective terms all of the underwriting considerations involved in determining insurability. Putting aside the question of the viability of the objective condition test after *Darner,* Country Life's argument misconstrues the scope of that test. Applied to insurable risk policies, this test only requires objectivity in the criteria by which *the temporary insurance* may be rejected. In other words, the insurer under an insurable risk conditional receipt must not retain the power, based solely on subjective criteria, to destroy the utility of the temporary insurance after a loss occurs. The objective condition test has no application to the insurer's decision to underwrite the "permanent" policy of insurance for which the applicant applied.

Country Life also implicitly asserts that a finding of temporary coverage in these circumstances will have dire consequences because it will result in the elimination of conditional receipts. It argues that this would "work a hardship on the insured" because "a new applicant who desired immediate coverage could not get it. No insurance company could afford to issue unconditional temporary insurance without knowing whether the applicant has pre-existing conditions." For several reasons, we are not persuaded.

First, Country Life's argument emphasizes the illusory nature of its conditional receipt. On the one hand, it argues implicitly that a new applicant who wants "immediate coverage" is entitled to it. On the other hand, it claims that no insurance company could af-

ford to issue temporary coverage without knowing whether the applicant is an insurable risk. This is precisely the approach that we find contravenes public policy. Country Life's conditional receipt procures money from an applicant as premium for immediate coverage, while at the same time it reserves to Country Life the right to defeat such coverage if a loss occurs. Rather than a benefit, this has been described as "mere trick upon the part of the insurance company to deceive an applicant...." *Western & Southern Life Ins. Co.*, 12 N.E.2d at 354.

█ More importantly, if an insurer wishes to protect itself against interim liability between the taking of the application and approval of the policy, the insurer need only delay acceptance of the premium. *Collister*, 388 A.2d at 1355; *see* 12A Appleman § 7237, at 188, 198–99. The insurer's only risk in such cases is the financial risk of not being compensated for the cost of investigation and perhaps a medical examination. 12A Appleman § 7237, at 199. It is perfectly legal for an insurer, where no binding receipt is executed, to make delivery of the policy a condition precedent to liability. *Id.* If, on the other hand, the insurer wishes to enjoy the substantial benefits it receives by taking the applicant's cash in advance, it must return what the applicant reasonably expects the insurer is selling: immediate—albeit perhaps only temporary—coverage. *Collister*, 388 A.2d at 1355. Otherwise, the approval condition is unconscionable and void for public policy reasons. *See, e.g., Dewar*, 143 Ariz. at 556, 694 P.2d at 1170.

### 2. The Condition of Completion of a Medical Exam

█ Next, we consider Country Life's argument that the receipt established as a condition precedent to interim coverage that Mr. Anderson submit to a medical exam. The problem with this argument is that it misrepresents the terms of the receipt. The receipt does not place the burden on Mr. Anderson to obtain a medical exam; the receipt only suggests that a medical exam may be necessary to Country Life's ultimate decision of whether to issue permanent insurance.

Furthermore, the fact that Country Life required a medical examination eighteen days after the application and before Mr. Anderson sustained a loss is beside the point. Country Life did not bind itself to provide insurance if Mr. Anderson was an insurable risk at the time of the medical examination. On the contrary, Country Life retained the absolute right, even after the medical examination, to deny all coverage without reference to any criteria, objective or not. And, under the conditional receipt, Country Life did not give up the right to collect a premium for each of the eighteen days before it requested a medical examination.

Country Life nevertheless argues, citing *Roscoe*, that the requirement of a medical exam has been upheld as an "objective" requirement. Country Life asserts, therefore, that its request for a medical exam was a valid condition precedent to coverage. We disagree. In *Roscoe*, the court found that a medical exam required by the insurer was a valid condition precedent to interim coverage, and the applicant was so informed when he paid the advance premium payment. 22 Ariz.App. at 285–86, 526 P.2d at 1083–84.

There, the temporary insurance was dependent only upon (1) the applicant obtaining the medical exam, and (2) an objective determination of his insurability as of the date of application. *See id.* Here, unlike *Roscoe*, the conditional receipt issued to the Andersons did not contain any objective condition requiring a medical exam. In fact, the conditional receipt established no objective requirements for insurability. Furthermore, Country Life retained the power to defeat the Andersons' interim coverage regardless of the results of the medical examination. Thus, assuming that *Roscoe* is still viable after *Darner*, it does not support Country Life's argument.

### 3. The Condition that a Claim be Made

█ Finally, Country Life argues that it owed no duty to provide coverage for Mr.

Anderson because Mrs. Anderson never submitted a claim. This argument is without merit. Arizona courts have made it clear that an insured is not required to make a claim for benefits when the insurer has denied coverage. *United States Fidelity & Guar. Co. v. Powercraft Homes,* 141 Ariz. 71, 74, 685 P.2d 136, 139 (App.1984). Here, Country Life notified Mrs. Anderson that the processing of Mr. Anderson's application was being discontinued. It also directed its agent to indicate to Mrs. Anderson that there was no interim coverage and to request that Mrs. Anderson sign a document confirming that fact. Thus, Mrs. Anderson was under no obligation to submit a claim before pursuing her action for breach of contract.

### 4. Claim For Insurance Bad Faith

■ In arguing that Country Life breached its duty of good faith and fair dealing with the Andersons, Mrs. Anderson focuses on the fact that Country Life discontinued the underwriting process for Mr. Anderson when it learned of his illness. Mrs. Anderson, however, has cited no authority that Country Life had a duty to continue processing the application after it determined that it would not issue a policy of permanent insurance to Mr. Anderson. This duty to process the application could only arise out of the contract for temporary insurance. But, as we have noted above, this temporary contract was not an insurable risk type binder. Thus, there was no duty for Country Life to make a good faith determination whether Mr. Anderson was an insurable risk at the date of application.

Mrs. Anderson also asserts in the opening brief that because of the Illinois Court of Appeals decision against Country Life in *Wernle,* "Country Life had been made aware that its conditional receipt creates a temporary contract of insurance." She does not, however, develop the argument or cite any cases to support the argument that Country Life denied temporary coverage without reasonable or fairly debatable grounds. We will therefore not consider this issue. *See* Ariz. R.Civ.App.P. 13(a)(6); *State Farm Mut. Auto. Ins. Co. v. Novak,* 167 Ariz. 363, 370, 807 P.2d 531, 538 (App.1990); *Mercantile Nat'l Life Ins. Co. v. Villalba,* 18 Ariz.App. 179, 180, 501 P.2d 20, 21 (1972).

■ In the reply brief, Mrs. Anderson, for the first time, raises the argument that it was unreasonable for Country Life to offer her coverage only if she would agree that her husband did not have temporary coverage. Arguments not presented until the reply brief may not be considered by this court. *Wasserman v. Low,* 143 Ariz. 4, 9 n. 4, 691 P.2d 716, 721 n. 4 (App.1984). Thus, we find no basis for reversing the summary judgment ruling as to the claim for breach of the duty of good faith and fair dealing.

## III. ATTORNEYS' FEES ON APPEAL

Both parties have requested attorneys' fees on appeal. Presumably, their requests are made pursuant to A.R.S. section 12–341.01. We deem Mrs. Anderson to be the successful party on the appeal and award attorneys' fees in an amount to be determined after compliance with Rule 21, Arizona Rules of Civil Appellate Procedure.

## IV. CONCLUSION

For the reasons given in this opinion, we affirm the trial court's grant of summary judgment to Country Life on the claim for breach of the duty of good faith and fair dealing. We reverse the breach of contract claim, however, and remand to the trial court for entry of judgment in favor of the Mrs. Andersons.

FIDEL, P.J., and CONTRERAS, J., concur.