2009 UT 18

**WORKERS' COMPENSATION FUND and Iverson Steel and Erection Company, Plaintiffs and Appellants,**

v.

**WADMAN CORPORATION, Defendant and Appellant,**

v.

**State of Utah Department of Administrative Services, Division of Risk Management; Argonaut Insurance Co.; and Washington County School District, Defendants and Appellee.**

Nos. 20070160, 20070180.

Supreme Court of Utah.

March 24, 2009.

Rehearing Denied June 24, 2009.

---

278

James R. Black, Dennis V. Lloyd, Salt Lake City, for appellant Workers' Compensation Fund.

Theodore E. Kanell, Russell W. Hartvigsen, Salt Lake City, for appellee.

NEHRING, Justice:

## INTRODUCTION

¶ 1 In this appeal, we determine who was responsible for paying workers' compensation benefits to Corey Searle, an employee of Iverson Steel and Erection Company, who was injured while working on the Santa Clara Middle School in Santa Clara, Utah. Iverson had a subcontract with Wadman Corporation to perform the steel erection component of the construction of the Santa Clara Middle School; Wadman was the entity retained by the Washington County School District to be the general contractor on the project. Argonaut Insurance Company provided the workers' compensation coverage for the project through an Owner–Controlled Insurance Program, which we will refer to as the OCIP. After Mr. Searle was injured, Argonaut refused to pay his claims. The Workers' Compensation Fund[1] then sued the Washington County School District; the State of Utah Department of Administrative Services, Division of Risk Management; Willis of Utah, Inc.; Wadman; and Argonaut. The WCF stipulated to a dismissal of its claim against Willis. The School District, the Division of Risk Management, and Argonaut successfully moved for summary judgment. The WCF appealed. It claims that the district court erred when it concluded that the defendants were not responsible for providing coverage to Iverson that covered Mr. Searle. After the appeal was filed but before oral argument, the WCF settled with the School District and the Division of Risk Management, leaving only the WCF's claim against Argonaut to be decided. As we conclude that Mr. Searle was Wadman's statutory employee, we reverse.

## BACKGROUND

¶ 2 While working on the Middle School project for the School District, Mr. Searle severely injured both legs when he fell two stories and landed on concrete. Insurance coverage for the Middle School project was controlled by the OCIP, which was initially created by the Division of Risk Management. After the OCIP's creation, each school district within Utah had the option of participating in the OCIP to help reduce construction costs. The School District chose to participate in the OCIP for the Middle School project. Argonaut was the designated workers' compensation insurance carrier for all contractors and subcontractors who enrolled in the OCIP. As part of its contract with the School District, Wadman agreed to purchase workers' compensation insurance through the

---

1. Iverson was initially a plaintiff in this case, but it subsequently assigned its rights to the WCF.

OCIP. Wadman also agreed to be responsible for ensuring that all subcontractors were enrolled with the OCIP carrier, Argonaut.

¶ 3 Although Wadman initially verified that all subcontractors were properly enrolled in the OCIP, the steel erection subcontractor originally retained by Wadman fell behind schedule and Wadman replaced it with a new subcontractor, Iverson, to complete the steel erection work. Wadman rejected Iverson's initial bid for the work, but an agreement was reached after Iverson reduced its price to pass through to Wadman the savings in workers' compensation premiums that Iverson would realize because of the OCIP. After Iverson agreed to the contract, Wadman trained Iverson in the safety practices required by the OCIP, but it failed to send the OCIP enrollment form for Iverson to Willis, the insurance broker that was assigned to be the OCIP administrator. Iverson began working on the project on January 28, 2002, and Argonaut began receiving insurance premiums for the job. The WCF, Iverson's alternate insurance provider, did not receive premiums for the Middle School project. Argonaut's Senior Safety Management Consultant, J. Lemanski, later inspected the construction site for safety, but he did not comment on Iverson's enrollment status. On February 7, 2002, Mr. Searle was injured. The following day, Wadman submitted the enrollment form for Iverson to Willis. Argonaut later issued Iverson an insurance policy, but the effective date of the policy was February 8, the day after the accident.

¶ 4 Iverson submitted a claim for Mr. Searle's injury to Argonaut, which Argonaut denied. Argonaut based its denial on the fact that the enrollment form was not submitted until the day after Mr. Searle's accident. The WCF then sued Argonaut, the Division of Risk Management, the School District, Willis, and Wadman. The defendants moved to dismiss. First, they contended that the WCF did not have standing to bring its claim because it was not injured. The WCF successfully overcame the challenge to its standing by noting that it had obtained an assignment of rights from Iverson and had paid Mr. Searle's claim.

¶ 5 Following discovery, the WCF stipulated to a dismissal of its claims against Willis. The School District and the Division of Risk Management moved for summary judgment. They asserted that they could not be considered the employers or insurers of Iverson because no contractual obligation existed that required them to pay workers' compensation. Argonaut also moved for summary judgment, arguing that it did not have a responsibility to provide insurance for Mr. Searle because Wadman did not have agency authority to act for Argonaut, Iverson's employees were not loaned, the enrollment form for Iverson was not submitted until after the accident, and Wadman was not the statutory employer of Mr. Searle. Wadman opposed the other defendants' motions for summary judgment and amended its answer to include cross-claims against Argonaut, the School District, and the Division of Risk Management. The district court held a hearing on all the motions before it and granted summary judgment in favor of the School District, the Division of Risk Management, and Argonaut. It also held that the grant of summary judgment to those defendants made Wadman's cross-claims moot.

¶ 6 The WCF appealed. Wadman filed a separate appeal. The cases were assigned together for mediation. On September 7, 2007, prior to the mediation, Wadman assigned its rights to the WCF. Mediation between the WCF, the School District, the Department of Risk Management, and Argonaut was not successful. A briefing schedule was set, and the WCF timely filed a brief in which it advanced the claims of Iverson and Wadman that had been assigned to it. The WCF argued that the district court's grant of summary judgment to Argonaut, the School District, and the Division of Risk Management was in error. Prior to oral argument, the WCF stipulated to the dismissal with prejudice of its claims against the School District and the Division of Risk Management. The WCF's only remaining claim on appeal is, therefore, that the district court erred in granting summary judgment to Argonaut. The WCF advances the following arguments for requiring Argonaut to provide coverage for Mr. Searle's accident: (1) Wadman was Argonaut's agent and bound Argo-

naut to provide coverage, (2) Iverson's employees were loaned employees and were covered by the Alternate Employer Endorsement of the Argonaut Policy, (3) Argonaut must provide coverage because the Middle School was an OCIP project and Argonaut was an OCIP insurer, and (4) Argonaut must provide coverage because Wadman was the statutory employer of Mr. Searle and because Argonaut was bound to cover workers' compensation claims against Wadman.

## STANDARD OF REVIEW

¶ 7 In order for summary judgment to be granted, there must be no issue of material fact and the moving party must be entitled to judgment as a matter of law. Utah R. Civ. P. 56(c); *Bowen v. Riverton City*, 656 P.2d 434, 435 (Utah 1982). The essential facts of the case regarding the terms and manner of Mr. Searle's employment are undisputed. As a result, the responsibility of Argonaut to pay compensation for Mr. Searle's accident is an issue of law that we will decide. *Bennett v. Indus. Comm'n*, 726 P.2d 427, 429 (Utah 1986); *Whitehead v. Safway Steel Prods., Inc.*, 304 Md. 67, 497 A.2d 803, 806 (1985). The court has jurisdiction over this matter pursuant to Utah Code section 78A-3-102(3)(j) and gives no deference to the district court's conclusions of law, *Krantz v. Holt*, 819 P.2d 352, 353 (Utah 1991).

## ANALYSIS

■ ¶ 8 The purpose of the Workers' Compensation Act is to provide compensation to injured employees "by a simple and speedy procedure which eliminates the expense, delay and uncertainty" in proving fault. *Wilstead v. Indus. Comm'n*, 17 Utah 2d 214, 407 P.2d 692, 693 (1965); *see Shupe v. Wasatch Elec. Co.*, 546 P.2d 896, 900 (Utah 1976) (Maughan, J., dissenting). When a dispute arises regarding workers' compensation insurance, "inferences . . . constituting a worker's right to recover are liberally construed" in favor of the employee. *Baker v. Indus. Comm'n*, 17 Utah 2d 141, 405 P.2d 613, 614 (Utah 1965). The WCF argues that various doctrines have been created to afford employees compensation and to prevent employers from avoiding responsibility. Specif-

ically, it argues that Argonaut should have been required to provide coverage based on the theory of agency authority, the loaned employee doctrine, the requirement that insurance contracts be interpreted in favor of the employee, and the statutory employer doctrine. We will discuss each of these theories in turn, concluding that despite shortcomings of the first three, Mr. Searle was the statutory employee of Wadman and therefore covered by its compensation carrier, Argonaut.

## I. WADMAN DID NOT HAVE AGENCY AUTHORITY TO ACT FOR ARGONAUT

■ ¶ 9 The WCF claims that Wadman acted as Argonaut's agent, which obligated Argonaut to provide insurance. The argument presented is that a principal, Argonaut, is bound by the acts of an agent who has apparent authority to act. The WCF and Iverson contend that since Wadman acted as if it had authority to complete the workers' compensation enrollment process, Argonaut was bound by Wadman's actions. *See* Restatement (Second) of Agency § 8 (1958); *Vickers v. N. Am. Land Devs., Inc.*, 94 N.M. 65, 607 P.2d 603, 604 (1980).

■ ¶ 10 We indicated in *Luddington v. Bodenvest, Ltd.* that in order to cloak a presumptive agent with authority, " 'the principal [must have] manifested his . . . consent to the exercise of such authority or [have] knowingly permitted the agent to assume the exercise of such authority.' " 855 P.2d 204, 209 (Utah 1993) (quoting Am.Jur.2d *Agency* § 80 (1986)). We also stated that "[i]t is the principal who must cause third parties to believe that the agent is clothed with apparent authority." *City Elec. v. Dean Evans Chrysler–Plymouth*, 672 P.2d 89, 90 (Utah 1983). It is only when this consent has been manifested by the principal that the agent has "the power to affect the legal relations of the principal." Restatement (Second) of Agency § 7 (2007).

¶ 11 The WCF and Iverson argue that Wadman's actions imply that agency authority existed. The record, however, contains no evidence that Argonaut contributed to the

formation of a belief that Wadman was Argonaut's agent or that Argonaut knowingly permitted Wadman to "assume the exercise of such authority." *Luddington,* 855 P.2d at 209. Argonaut contracted with Willis to act as its agent, with the authority to receive all enrollment forms and issue safety manuals. The limit of Wadman's workers' compensation responsibility was to verify that subcontractors were properly enrolled in the OCIP as required by Wadman's contract with the School District.

¶ 12 If Iverson believed that an agency relationship existed between Wadman and Argonaut, it was Iverson's responsibility to verify that Argonaut had conferred this authority on Wadman. *Zions First Nat'l Bank v. Clark Clinic Corp.,* 762 P.2d 1090, 1095 (Utah 1988) (holding that "one who deals exclusively with an agent has the responsibility to ascertain that agent's authority despite the agent's representations"). Since Iverson did not verify that Wadman had agency authority and since Argonaut never stated that such an authority existed, Wadman could not have acted to bind Argonaut as Iverson's workers' compensation insurer.

## II. IVERSON'S EMPLOYEES WERE NOT "LOANED" EMPLOYEES

■ ¶ 13 The WCF also contends that Iverson's employees were "loaned" to Iverson by Wadman and consequently were covered by the Alternate Employer Endorsement of Argonaut's workers' compensation policy with Wadman. The WCF failed to state what was meant by a "loaned employee" in its brief and did not explain or include the full text or background of the Alternate Employer Endorsement. Consequently, the substance of its argument is unclear. We assume, however, that the WCF was referring to the rule set forth in *Ghersi v. Salazar,* 883 P.2d 1352, 1356–57 (Utah 1994). *Ghersi* indicates that an employee is loaned if " '(a) the employee has made a contract of hire, express or implied, with the special employer; (b) the work being done is essentially that of the special employer; and (c) the special employer has the right to control the details of the work.' " *Id.* (quoting 1B Arthur Larson, *Workmen's Compensation Law* § 48.00, at 8–343 (1992)). The loaned employee doctrine typically applies when a temporary agency or general employer hires employees, placing them on company payroll, and then loans the employees to other "special" employers to actually perform work. *Id.*

¶ 14 The WCF's argument regarding how Iverson's employees were loaned is ambiguous. The WCF does claim, however, that Iverson was Wadman's special or alternate employer and should therefore receive compensation from Wadman's insurance provider, Argonaut. It appears that the WCF contends that Wadman hired Iverson's employees as the "general employer" and then loaned the employees back to Iverson as the temporary or "special employer," which obligated Argonaut, as Wadman's insurance provider, to supply coverage under the Alternate Employer Endorsement.

¶ 15 The loaned employee doctrine presupposes that workers are "under contract to the [general labor] service to work as an employee for a client" and that the general employer, which is typically the temporary agency but in this instance would be Wadman, is merely loaning the employees and not supervising the actual work. *Ghersi,* 883 P.2d at 1356–57; *see also Word v. Motorola, Inc.,* 135 Ariz. 517, 662 P.2d 1024, 1025 (1983). Here Iverson's employees did not have a contract with Wadman and no evidence was presented that Iverson's employees were on Wadman's payroll or would continue working for Wadman after the project was complete. The inclusion of employees on the company payroll and their continued employment with the general employer after the completion of the project are key factors in determining if an employee is loaned. *See Ghersi,* 883 P.2d at 1356–57. Iverson contracted with Wadman as a company to perform work on the project. Since no contract existed between Wadman and the employees, as evidenced by the fact that the employees were not directly paid by Wadman, Wadman could not have loaned the employees to other entities. Furthermore, Wadman was responsible for supervising Iverson's work, so a loaned-employee relationship could not have existed.

¶ 16 The alternate argument that Iverson loaned its employees to Wadman as the special employer also does not apply in this case. A central test in determining if a labor service loaned its employee is if it "was *not* responsible for performance of the construction work." *Word*, 662 P.2d at 1025 (emphasis added). Iverson was responsible for the steel construction work; therefore, it did more than furnish laborers. Because Iverson provided laborers, contracted to erect the steel on the project, and took responsibility for the performance of the steel work, it could not have loaned its employees to Wadman. Since no evidence was presented that Argonaut had a contract with Iverson to provide workers' compensation coverage for its loaned employees, the designation of Iverson's employees as "loaned"—and it is clear that they were not "loaned"—is of no legal consequence.

## III. NO CONTRACT WAS CREATED BETWEEN IVERSON AND ARGONAUT IN THE ABSENCE OF THE COMPLETED ENROLLMENT FORM

¶ 17 The WCF argues that a contract of insurance was formed between Argonaut and the state to provide coverage for Iverson since Argonaut was part of the "OCIP team" and was required to provide insurance to all subcontractors. The WCF further contends that the failure to submit the enrollment form was immaterial to the formation of a contract of insurance between Iverson and Argonaut and therefore the contract should be enforced.

¶ 18 The notion that an implied contract existed between Argonaut and other participants in the OCIP team that required Argonaut to provide insurance to all subcontractors is not supported by the terms found in the OCIP manual. The OCIP manual supplemented the individual insurance policies issued to contractors and subcontractors and set forth the terms of the OCIP. The manual states that it "identifies, defines, and assigns responsibilities related to the administration of the [OCIP]." It also "[d]escribes the OCIP and details the insurance-related responsibilities of the various parties involved;" however, it "is not intended to provide coverage inter-

pretations" and the "terms and conditions of the policies alone govern how coverage is applied."

¶ 19 Although the policy alone determines coverage, the OCIP manual was nevertheless an essential element in defining the contractual relationships that existed between the OCIP team members. The manual specifies that its terms are binding and "[t]he requirements of the [OCIP] Manual, including State of Utah OCIP Safety and Health Manual, shall become a part of [the] Contract Agreement." It also states that any "Contractor/Subcontractor shall cause all provisions and requirements of the OCIP to be included in any contract/subcontract agreement . . . and shall assure compliance."

¶ 20 As a binding agreement defining the contractual obligation among its parties, the OCIP manual mentions the existence of an "OCIP team," but does not require that the team supply insurance to all subcontractors. The safety manual defines the OCIP team as "the Owner (STATE OF UTAH/ENGINEER), WILLIS CORROON and all applicable insurance carriers or the representative of defined State agencies and firms working together to implement the insurance program." The manual specifies that the owner's responsibility consists of providing general support for the worksite. The OCIP manual specifically contemplates the possibility that a contractor may choose not to enroll with the OCIP insurance provider. The manual specifies that "[non-enrolled] contractors should notify their own insurance company" instead of the OCIP insurance of injuries. The OCIP manual also repeatedly states that although all subcontractors *should* enroll in OCIP, coverage is only valid for properly enrolled subcontractors, stating that "[t]he OCIP will be only for the benefit of . . . Contractor/Subcontractor(s) of all tiers who have been properly enrolled in the OCIP program." In order to be properly enrolled, the manual specifies that all contractors/subcontractors are required to submit enrollment forms and complete certain requirements. Each subcontractor also received a separate contract of insurance. The necessity of each subcontractor obtaining a separate contract of insurance and enrolling separate-

ly in the OCIP indicates no general contract of insurance existed between Argonaut and all subcontractors.

¶ 21 In the absence of a contract being formed by the existence of the OCIP, the question remains if a contract was otherwise created between Iverson and Argonaut. When determining the starting date of an insurance contract, the law looks to the contract terms. *Vestin Mortgage, Inc. v. First Am. Title Ins. Co.*, 2006 UT 34, ¶ 8, 139 P.3d 1055 ("An insurance policy is merely a contract between the insured and the insurer and is construed pursuant to the same rules applied to ordinary contracts." (internal quotation marks omitted)).

¶ 22 The Argonaut enrollment expressly states that before any contractors or subcontractors start work on the project, Willis must receive the form. The OCIP manual confirms this requirement and indicates that although "[t]he 'Start Date' indicated on the contract award form is the date that the Contractor/Subcontractor is expected to begin operations at the Project Site," all subcontractors are to be properly enrolled before access to the project site is allowed and coverage begins.

¶ 23 The WCF argues that the form was not an essential element of the contract. It cites testimony from Argonaut's vice president from a different case in which he opined that if the State of Utah rolling wrap-up pieces were all in place, Argonaut would provide coverage even without the form. This statement, however, does not mean that the enrollment form, despite being expressly made a part of the insurance contract, is superfluous. Rather, the testimony illustrates that in one instance, an Argonaut executive speculated that the form may not have been necessary. In contrast to that statement, the OCIP manual repeatedly states that submitting the form is required to complete OCIP enrollment and that the form must be received by Willis before any subcontractors can start work. The form is necessary because it allows the insurance agent to track applications for enrollment and obtain necessary information for setting insurance rates.

¶ 24 The WCF maintains that Wadman's payment of a premium for Iverson's coverage to Argonaut and not the WCF demonstrates that the form was a mere technicality and that a contract of insurance already existed between Argonaut and Iverson. The WCF and Iverson fail to cite any case law supporting this assertion. Several states, including Utah, have treated as enforceable "binder" agreements between an insurance provider and an insured that provide temporary insurance before the actual policy is issued. *See Williams v. First Colony Life Ins. Co.*, 593 P.2d 534 (Utah 1979). These binder agreements, however, typically require an application to be submitted and the insurer to provide a conditional receipt specifying the terms of the binder. *Cain v. Aetna Life Ins. Co.*, 135 Ariz. 189, 659 P.2d 1334 (1983); *Springer v. Allstate Life Ins. Co. of N.Y.*, 94 N.Y.2d 645, 710 N.Y.S.2d 298, 731 N.E.2d 1106 (2000). The binder agreements also require, according to the Fifth Circuit, that all conditions specified by the insurance provider be met, *Gladney v. Paul Revere Life Ins. Co.*, 895 F.2d 238 (5th Cir.1990), "in order for a contract of temporary insurance to exist," *Fox v. Catholic Knights Ins. Soc'y*, 2003 WI 87, ¶ 23, 263 Wis.2d 207, 665 N.W.2d 181 (2003) (citations and internal quotation marks omitted). Although premiums were paid to Argonaut, none of the other requirements for a binder agreement were met.

¶ 25 We previously stated that although "it is unfair for an insurer to collect a premium which purports to cover a period when in fact no such coverage exists: i.e., between the time of the application and the delivery of the policy," it is for

> this reason, we have approved the rule that ordinarily, when the insured has done everything required of him and paid his premium, the insurance takes effect from the time of the issuance of a binding receipt, even though the policy has not been delivered. This is especially so when death or injury occurs from some cause unrelated to any possible ground for rejecting the application.

*Williams*, 593 P.2d at 537.

¶ 26 In this case, the application or enrollment form was never received by Argo-

naut and the insurance company never issued a binding receipt. Argonaut clearly stated that receipt of the enrollment form was a prerequisite to coverage. Since Iverson was required to submit the form and no binding receipt was given, no contract was created. The terms of the OCIP manual were clear. The manual plainly stated that the form must be submitted as part of the enrollment process.

■ ¶ 27 The WCF alternately argues that Argonaut was required to provide coverage since it had a responsibility to verify that all subcontractors were properly enrolled as part of its contract with the OCIP. It contends that J. Lemanski, Argonaut's Senior Safety Management Consultant, was on the job inspecting the premises for safety before the accident, had knowledge of Iverson's involvement, and had a responsibility to verify that those working on the site were insured as part of the safety inspections.

¶ 28 Evaluating the safety of a job site is not the same as verifying that a subcontractor has met all of the conditions necessary to commence insurance coverage. The OCIP Safety and Health Manual states, "Each Contractor shall bear sole and exclusive responsibility for safety in all phases of their work. Nothing contained herein shall relieve such responsibility." It also states that the role of OCIP team members includes the "overall management responsibility for site safety and health," but "[t]his responsibility does not supersede, override, or take precedence over that of Contractors who are ultimately responsible for the safety and health of their employees...." The duty of OCIP team members was to oversee safety, not to relieve contractors of responsibility. There is nothing in the OCIP manual that indicates Argonaut contracted with the Division of Risk Management to be responsible for ensuring that all subcontractors were properly enrolled. In contrast, the OCIP manual clearly specifies that Wadman had a responsibility to ensure that all subcontractors were properly enrolled, and pursuant to Utah Code section 34A–2–201, Iverson also had the responsibility of making sure that its employees were insured, which it failed to do. Although Argonaut may have had a responsibil-

ity to conduct safety inspections, verification that Iverson was properly enrolled was beyond the scope of Argonaut's responsibility.

## IV. MR. SEARLE WAS A STATUTORY EMPLOYEE OF WADMAN

¶ 29 In response to motions for summary judgment in the district court, the plaintiffs contended that Argonaut and Wadman were Mr. Searle's statutory employers for purposes of workers' compensation coverage. The WCF reiterates those arguments here, urging us to find that under the OCIP "common law employee/employer relationships are altered" and the key element in determining a statutory relationship is the right to control.

¶ 30 Argonaut asserts that the statutory employer argument should be dismissed because the argument is a claim that could only be brought by Wadman and because Wadman failed to file an appellate brief. It is true that Wadman did not file an appellate brief; Wadman, however, assigned its rights to the WCF prior to the mediation and before a briefing schedule was set. Accordingly, the WCF had the right to bring a claim directly against Argonaut for coverage based on any claim that Wadman had. The WCF did so on February 7, 2008, when it filed its opening brief in which it asserted that Wadman was Mr. Searle's statutory employer and coverage should be provided by Argonaut. Argonaut also argues that the brief filed by the WCF does not raise any of Wadman's claims. Although the WCF's brief does not discuss the elements of the statutory employer doctrine in great detail, it does claim that Wadman was the statutory employer of Iverson, which was sufficient to put Argonaut on notice of the statutory employer argument. Since Wadman assigned its rights to the WCF and since the joint brief raised Wadman's claims, the WCF's statutory employer claim should not be dismissed.

■ ¶ 31 Utah Code section 34A–2–103(2) defines the circumstances under which an employer/employee relationship is created as a matter of law. This section states that an employer is someone "who regularly employs

one or more workers or operatives in the same business, or in or about the same establishment." Utah Code Ann. § 34A–2–103(2) (Supp. 2008)[2]. Section 34A–2–103(7)(a)(ii), the statutory employee section, also indicates that if

> an employer *procures any work to be done* wholly or in part for the employer by a contractor over whose work the employer *retains supervision or control,* and this work is a *part or process in the trade or business of the employer,* the contractor, all persons employed by the contractor, all subcontractors under the contractor, and all persons employed by any of these subcontractors, are considered employees of the original employer for the purposes of this chapter.

Utah Code Ann. § 34A–2–103(7)(a)(ii) (emphasis added). In *Bennett v. Industrial Commission,* we clarified that the term "supervision or control" includes the general contractor's ultimate control over the project. 726 P.2d 427, 432 (Utah 1986); *see also Pinnacle Homes, Inc. v. Labor Comm'n,* 2007 UT App 368, ¶ 21, 173 P.3d 208.

¶ 32 In general, Argonaut cannot be described as a statutory employer merely because it participated in the OCIP. In order for a statutory employer relationship to exist, the employer must procure the work to be done, retain supervision and control, and the work must be part of the employer's trade or business. Utah Code Ann. § 34A–2–103(7)(a)(ii). Argonaut was not the statutory employer of Iverson in this case because Argonaut did not procure the services of Iverson, did not have ultimate control over Iverson's work, and was not in the trade or business of construction.

¶ 33 In contrast, the WCF correctly contended that Wadman was Iverson's statutory employer. Wadman hired Iverson to complete the steel work and therefore procured Iverson's services. Wadman also exercised control over the project by supervising Iverson's work. Finally, Wadman's line of trade and business was construction, and thus erecting the steel part of the building was

part of its trade and business. Because Wadman satisfies all the elements in section 34A–2–103(7)(a)(ii), it is the statutory employer of Mr. Searle.

¶ 34 Even if the level of supervision exercised by Wadman was uncertain, an inference of supervision would still automatically arise because the work being performed was part of the employer's business. *Bennett,* 726 P.2d at 432. In *Bennett,* we determined that even though general contractors frequently delegate a substantial amount of work to subcontractors, the general contractor remains responsible so long as the subcontractor's work is a part or process of the general contractor's business. *Id.* In this case, the steel construction performed by Iverson was part of Wadman's general business of construction and an inference of control arose because Wadman was the general contractor.

¶ 35 Argonaut claims that Iverson already had coverage through the WCF and therefore the statutory employer doctrine did not apply. Argonaut also contends that the WCF, having paid Mr. Searle's claim, had the right to seek reimbursement of unpaid premiums from Iverson, and therefore Iverson had coverage through the WCF. The WCF counters these arguments, stating that the insurance coverage Iverson received from the WCF did not cover the Middle School project and that Argonaut, not the WCF, received premiums for the Middle School project.

[11] ¶ 36 Typically, an employee cannot reach through the layers of employers any further than the first-insured contractor. *Jacobsen v. Indus. Comm'n,* 738 P.2d 658, 661 (Utah Ct.App.1987). Section 34A–2–103(7)(e) states that the statutory employer doctrine is applicable to contractors and subcontractors unless "the employer who procures work to be done by the contractor or subcontractor obtains and relies on ... a valid certification of the contractor's or subcontractor's compliance with Section 34A–2–201." Section 34A–2–201 provides,

---

**2.** The legislature amended Title 34 in 2008. Because the changes do not affect our analysis, we cite to the 2008 version.

An employer shall secure the payment of workers' compensation benefits for its employees by:

(1) insuring, and keeping insured, the payment of this compensation with the Workers' Compensation Fund;

(2) insuring, and keeping insured, the payment of this compensation with any stock corporation or mutual association authorized to transact the business of workers' compensation insurance in this state; or

(3) obtaining approval from the division in accordance with Section 34A–2–201.5 to pay direct compensation as a self-insured employer in amount, in the manner, and when due as provided for [by statute].

¶ 37 Iverson did not provide Wadman with a certificate of compliance with section 34A–2–201 for the Middle School project. It could not have because it informed the WCF that Iverson's employees working on the Middle School project would not need to be covered by the WCF while they were working on the project.

¶ 38 Iverson did, however, provide some documentation of the WCF coverage to Wadman. Under the OCIP, all subcontractors and contractors were required to provide proof of 34A–2–201 compliance for off-site activities in order to enroll in the OCIP. Iverson had to demonstrate compliance with the off-site insurance requirement by showing that it had coverage through the WCF for off-site jobs, which it did. This coverage did not preclude Iverson from being a statutory employee for the Middle School project since Wadman never received information that Iverson had other insurance for the project. Utah Code Ann. § 34A–2–103(7)(e). To the contrary, Wadman requested that Iverson reduce its bid in anticipation of the OCIP, not Iverson's usual insurance covering all work-related incidents on-site, and paid the premium for Iverson to be covered under the OCIP. Wadman informed Iverson that insurance would be provided, and Iverson acted upon this belief. In this case, Wadman did not rely on a certificate of insurance from Iverson, and therefore the statutory employer doctrine applies.

¶ 39 As for Argonaut's argument that Iverson actually had coverage through the WCF because the WCF chose to pay Mr. Searle's claim and could then seek reimbursement from Iverson for unpaid premiums, we find that it is without merit. If Argonaut's position was the law, employers that failed to enroll subcontractors in the OCIP could presumably escape statutory employer liability if the WCF chose to voluntarily pay injured workers. Wadman should not be allowed to avoid responsibility as the statutory employer of Iverson. Because Wadman procured Iverson's services and retained supervision and control over Iverson's work and because Iverson's work was part of the business of Wadman, we hold that Wadman was the statutory employer of Iverson and therefore the statutory employer of Mr. Searle.

¶ 40 In addition to finding Wadman to be the statutory employer of Iverson, we must determine if Argonaut, as Wadman's insurance provider, was required to pay workers' compensation benefits to Mr. Searle. Neither party contests that Wadman was properly enrolled in the OCIP. The renewed policy between Argonaut and Wadman became effective September 8, 2001, several months before the accident. In the absence of the policy later becoming invalid, the policy requires that Argonaut pay workers' compensation insurance benefits for all of Wadman's employees. The Supplemental General Conditions for OCIP does state that failure to follow procedure, such as verifying a subcontractor is enrolled, may result in the termination of coverage. The effect of this document on the policy, however, is unclear. In any case, Argonaut is required by law to give notice to Wadman of any policy cancellation. Section 34A–2–205(1)(b) states that a workers' compensation insurance policy "is in effect from inception until canceled by filing with the division or its designee a notification of cancellation in the form prescribed by the division within ten days after the cancellation of a policy." Since no notice was given to Wadman by Argonaut of the insurance policy being cancelled, the policy is still valid. Because Wadman's policy with Argonaut was still valid and Mr. Searle was the statutory employee of Wadman, Argonaut must pay Mr. Searle's compensation benefits.

## CONCLUSION

¶ 41 We find that Wadman did not have agency authority for Argonaut, that Iverson's employees were not loaned, and that Argonaut did not have a responsibility to ensure that Iverson was properly enrolled in the OCIP. We also find that there was no contract between Argonaut and Iverson. Argonaut still had a responsibility to provide insurance coverage for Mr. Searle, however, because Iverson and Mr. Searle were the statutory employees of Wadman and Argonaut was Wadman's insurance provider. Consequently, we reverse the district court decision granting Argonaut summary judgment and remand for action consistent with this opinion.

¶ 42 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WILKINS, and Justice PARRISH concur in Justice NEHRING's opinion.